## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CHRIS BARNARD and SINC MCEVENUE, in their capacity as the Shareholder Representatives for the former shareholders of Telmetrics Inc.,** | : : : : | **C.A. NO.** |
| Plaintiffs, | : : | |
| **v.** | : : | |
| **MARCHEX, INC.** | : : | |
| Defendant. | : : | |

## COMPLAINT

Plaintiffs, Chris Barnard and Sinc McEvenue, in their capacity as Shareholder Representatives of the former shareholders of Telmetrics Inc. ("Telmetrics") under the November 5, 2018 Share Purchase Agreement ("SPA") between Marchex, Inc. ("Parent" or "Marchex"), Marchex CA Corporation, a Nova Scotia corporation (a wholly-owned subsidiary of Parent), Telmetrics, a corporation formed pursuant to the laws of the Province of Nova Scotia (the "Company"), bring this action against Marchex, Inc. ("Marchex") and allege as follows:

## NATURE OF THE ACTION

1.    Plaintiffs assert claims against Marchex on behalf of the former shareholders of Telmetrics ("Shareholders"), in Plaintiffs' capacity as Shareholder Representatives, for Defendant's breaches of the SPA and for Defendant's misconduct, as identified herein. Plaintiffs seek money damages, specific performance and declaratory relief.

2.    Shareholders and Shareholder Representatives have suffered and continue to suffer damages as a direct and proximate result of Defendant's misconduct, material breaches of the SPA, breaches of an escrow agreement ("Escrow Agreement") and tortious misconduct identified herein.

3.     In this lawsuit, Plaintiffs request declaratory relief, damages resulting from Defendant's misconduct and specific performance of Defendant's obligations under the SPA.

## PARTIES

4.     Plaintiffs, Chris Barnard and Sinc McEvenue, are Shareholder Representatives of the former shareholders ("Shareholders") of Telmetrics, Inc. ("Telmetrics" or "Company") under the SPA.

5.     Pursuant to §6.3 of the SPA, Plaintiffs are designated as Shareholder Representatives and in that capacity, are vested with the power to transact matters of litigation on behalf of Shareholders in connection with the SPA.

6.     Chris Barnard is a citizen of Canada.

7.     Sinc McEvenue is a citizen of Canada.

8.     Marchex Inc. is a Delaware corporation and is a citizen of the state of Delaware.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00[1], exclusive of interest and costs.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(3). Plaintiffs' claims arise out of the SPA, which provides that any action or proceeding arising under or in connection with the SPA shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware. *See* SPA, §11.10.

---

[1] All dollar amounts referenced in this Complaint are expressed in United States currency.

11.    Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions to enforce the terms of the SPA.  Defendant further irrevocably waived any objection to personal jurisdiction in Delaware. *See* SPA, §11.10.

## BACKGROUND

12.    This case arises out of Defendant's misconduct towards the Shareholder Representatives and Shareholders[2] since the November 5, 2018 closing of the SPA. As detailed herein, Defendant has consistently breached and/or ignored its obligations under the SPA.

13.    As Shareholder Representatives, Plaintiffs have spent an inordinate amount of time attempting to merely obtain the information to which they are entitled under the SPA. Defendant has disregarded its obligations, acted with utter impunity and refused to conduct itself in good faith.

14.    The SPA was drafted to ensure that Plaintiffs would have access to  information in order to evaluate whether, after the closing of the SPA, the Company was being operated by Defendant in accordance with the SPA in order to achieve the Earnout (as defined in the SPA) and to enable Plaintiffs to understand whether the Financial Goals (as defined in the SPA) had been achieved such that payment of the Earnout Consideration (as defined in the SPA) would be due to the Shareholders.

15.    Defendant has refused to cooperate with Plaintiffs and has deliberately deprived Plaintiffs of information pertaining to the Company's operations since the closing of the SPA.

---

[2] On p. 60 of the SPA, the term "Seller" is defined as having the meaning set forth in the preamble to the SPA. The preamble to the SPA defines the Shareholders as those individuals listed on Exhibit A to the SPA and references each of them individually as "Seller." Accordingly, for purposes of this Complaint, the terms "Shareholders" and "Sellers" shall refer to the Shareholders listed on Exhibit A to the SPA.

16.    Defendant has also denied the Shareholders funds to which they are entitled under the SPA. First, Defendant has failed to pay monies owed upon the occurrence of an "Acceleration Event" under the SPA. Second, Defendant has wrongfully deprived Plaintiffs of funds from an escrow account that was governed by the SPA and the Escrow Agreement.

17.    Plaintiffs have been left with no choice but to file this action.

### *November 5, 2018 SPA*

18.    Marchex is a Seattle-based public company specializing in B2B call and conversation analytics. Marchex's business, in part, involves the use of artificial intelligence and machine learning to analyze conversation data between businesses and customers, providing customers with reporting designed to measure, among other things, the effectiveness of marketing programs.

19.    Telmetrics was also involved in the analysis of conversation data between businesses and their customers for the purpose of assisting its clients in evaluating the effectiveness of their own advertising campaigns. Marchex acquired Telmetrics for the purpose of adding Telmetrics' strength to Marchex's existing platform.

20.    Marchex acquired Telmetrics pursuant to the November 5, 2018 SPA. Pursuant to the SPA, the purchase price of Telmetrics was comprised of the following:

(1) $10,100,000.00 as upfront cash consideration (the "Upfront Cash Consideration");

(2) Up to $3,000,000.00 in cash based upon the achievement of targeted financial goals over two twelve-month periods (each, an "Earnout Period") following the closing date of the transaction (the "Earnout Consideration").

The Earnout Consideration and the Upfront Cash Consideration collectively constitute the "Purchase Price."

21.    The SPA closed on November 5, 2018 (the "Closing Date").

**The Earnout Periods**

22.    Pursuant to the SPA, a portion of the Purchase Price was to be paid as Earnout Consideration if certain Financial Goals were achieved. These "Financial Goals" were to be achieved over two twelve (12) month periods following the closing date of the SPA and were set forth in Exhibit B to the SPA. *See* SPA, §1.2(b).

23.    The SPA provided for two "Earnout Periods" as follows:

    a.    The first twelve months following the Closing Date (referred to herein as "Y1 Earnout Period");

    b.    The second twelve months following the Closing Date (referred to herein as "Y2 Earnout Period").

*See* SPA, §1.2(b).

24.    Pursuant to §1.2(b) of the SPA, within ninety (90) days after the end of the Y1 Earnout Period, Defendant was required to pay the Earnout Consideration ($1,250,000.00) for the Y1 Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA.

25.    Similarly, pursuant to §1.2(b) of the SPA, within ninety (90) days after the end of the Y2 Earnout Period, Defendant was required to pay the Earnout Consideration ($1,750,000.00) for the Y2 Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA.

**§1.8(a) of the SPA**

26.     During each earnout period, Defendant was required to carry out the business of the Company in the ordinary course, act in a good faith and in a commercially reasonable manner with respect to the operation of the Company's business. *See* SPA, §1.8(a). Specifically, Section 1.8(a) provided as follows:

> 1.8    <u>Earnout</u>.
>
>        (a)    Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

27.     Thus, Section 1.8(a) of the SPA required Marchex to:

  a.  Act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business;

  b.  Cause each of its subsidiaries not to, and require each of its respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA[3] for purposes of achieving the Financial Goals.

---

[3] "OIBA" is defined in Exhibit B to the SPA as "operating income before amortization."

### §1.8(b) of the SPA

28.     Under Section 1.8(b) of the SPA, Defendant was obligated to provide Plaintiffs, no later than 75 days following the conclusion of each Earnout Period, a statement regarding the performance of certain financial goals and other documents as Plaintiffs would reasonably request.  Specifically, Section 1.8(b) provided as follows:

> (b)     The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.  For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

29.     Thus, Marchex was obligated to prepare and deliver to the Shareholder Representatives, no later than seventy-five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals had been achieved (an "Earnout Statement"), and "**such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.**" *See* SPA, §1.8(b) (emphasis added).

### §1.8(c) of the SPA

30.     Section 1.8(c) of the SPA provided a mechanism for the resolution of disputes between Marchex and the Shareholder Representatives regarding any Earnout Statement. The SPA provided that Marchex and the Shareholder Representatives would first attempt to resolve any disagreements in good faith.

31.     Specifically, Section 1.8(c) provided as follows:

> (c)    If the Shareholder Representatives disagree with an Earnout Statement, the Shareholder Representatives shall notify the Parent on or before the date fifteen (15) days after the date on which the Parent delivers to the Shareholder Representatives such Earnout Statement, failing which such Earnout Statement shall be deemed to be accepted by the Sellers with respect to the corresponding Earnout Period.   The Parent and the Buyer shall give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under this Section 1.8.   The Parent and the Shareholder Representatives shall attempt to resolve any such disagreements in good faith.   If the
>
> 5
>
> CAN: 28618682.8
>
> Parent and the Shareholder Representatives are unable to resolve all such disagreements on or before the date fifteen (15) days following notification by the Shareholder Representatives of any such disagreements, the Parent shall retain the Final Accounting Firm to resolve all such disagreements, who shall adjudicate only those items still in dispute with respect to the Earnout Statement.

32.    Pursuant to Section 1.8(c) of the SPA, if a dispute over an Earnout Statement could not be resolved, Defendant would then be obligated to retain an accounting firm ("Final Accounting Firm") to resolve disagreements over the Earnout Statement.

33.    Marchex was further required to give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under Section 1.8. *See* SPA, §1.8(c).

34.    In other words, the SPA provided the Shareholder Representatives with a broad right to access and view any and all information about the Company and its performance so that they could evaluate whether or not the Financial Goals had been achieved, whether or not the Shareholders were entitled to the Earnout Consideration and whether or not Marchex had properly calculated whether the amounts set forth in the Earnout Statement for that particular year.

**§1.8(e) of the SPA**

35.    On page 53 of the SPA, the SPA defined an "Acceleration Event" as any number

of events, as set forth below:

> "*Acceleration Event*" means any of the following: (a) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in connection with the first Earnout Period has been earned as a result of achieving the applicable Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not resigned without Good Reason or been terminated for Cause and the Parent reduces the Company's workforce to less than 35 employees without consent of the Shareholder Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or (e) the Company becomes subject to wind-up, liquidation or dissolution.

36.    Upon the occurrence of an Acceleration Event (as defined in the SPA), Section

1.8(e) of the SPA provided as follows:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then, following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the applicable Earnout Period.

37.    If an Acceleration Event occurred, payment pursuant to Section 1.8(e) was either

due within 90 days of November 5, 2019 (or February 3, 2020) or within 90 days of November

5, 2020 (of February 3, 2021).

38.    Section 11.12 of the SPA also provided Plaintiffs with the right to seek specific

performance and/or injunctive and/or equitable relief without the necessity of posting a bond or

proving actual damages:

11.12 <u>Specific Performance</u>. In addition to any and all other remedies that may be available at Law in the event of any breach of this Agreement, the parties hereto shall be entitled to specific performance of the agreements and obligations hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction, without the necessity of posting a bond or proving actual damages.

### *Disputes Between the Parties*

### Financial Goals

39.    In or around September 2019, Shareholder Representatives became concerned with the lack of visibility into the operations of the Company provided to them by Marchex.

40.    Marchex had not provided Mr. Barnard and Mr. McEvenue with sufficient information about the Company in order to enable them to evaluate either the Company's performance or whether it was being operated in a commercially reasonable manner so as to give the Company a fair chance of achieving the Earnout for the Y1 Earnout Period, as required under the SPA.

41.    This concern was precipitated in part by the fact that Andrew Osmak, who had been the Company's CEO, was on an extended medical leave. Mr. Barnard and Mr. McEvenue were concerned about Defendant's management of the Company and the strategic direction of the Company, particularly given the fact that no acting CEO was put in place by Marchex, given Osmak's absence, in violation of Defendant's duty to act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business per Section 1.8(a) of the SPA.

42.    Accordingly, on September 10, 2019, Mr. Barnard communicated to Defendant and specifically requested that Defendant, pursuant to Section 1.8(b) of the SPA, provide the following information:

a.  Information regarding who was managing the strategic direction and the operations of the Company in Andrew Osmak's absence;

b.  Information regarding who was maintaining the Company's client relationships and working on business development and sales initiatives that Mr. Osmak had in place prior to the commencement of his medical leave;

c.  A list of the Company's management team;

d.  The Company's business plan;

e.  An update on how the Company was tracking in relation to the Financial Goals (as defined in the SPA);

f.  An overview of the strategy for maximizing the Company's revenue;

g.  An overview of any steps that had been taken or were planned with respect to integration of Marchex and the Company that may have impacted the Company's achievement of its stated revenue goals;

h.  An explanation of the circumstances surrounding the medical leave of the Company's CEO, Andrew Osmak.

43.    On September 13, 2019, Defendant, through its general counsel, Michelle Paterniti ("Paterniti"), refused to provide any of the requested information based on the false pretext that the requested information constituted nonpublic financial and operational information regarding the Telmetrics business and could not be disclosed pursuant to U.S. securities laws.

44.    On November 1, 2019, Defendant sent a document, purporting to be a Claim Notice, which alleged that certain representations made by the Shareholders under the SPA were

false. The purported "Claim Notice" did **not** identify any *actual* losses but rather, referenced "estimated Losses in excess of US$760,000".

45.     On November 10, 2019, Mr. Barnard corresponded to Defendant disputing the validity of the Claim Notice and articulating the Shareholder Representatives' position on the Claim Notice, as follows: (1) categorically denying any breach of any representation under the SPA; (2) disputing that a valid "claim notice" had been delivered (due to the fact that Defendant had only referred to losses that "may" occur in the future and had not identified any *actual* losses or provided the supporting documentation required by the SPA); (3) requesting immediate release of the Escrow Deposit (less $250,000.00); and (4) reiterating the Shareholder Representatives' request for disclosure with respect to the Earnout for the Y1 Earnout Period pursuant to Section 1.8 of the SPA.

46.     On November 13, 2019, Mr. Barnard corresponded to Paterniti asking when the Escrow Deposit would be released, as well as when Shareholder Representatives would receive feedback on their request for information relating to the Financial Goals.

47.     On November 19, 2019, Mr. Barnard corresponded to Defendant's representatives, Mike Arends and Russell C. Horowitz, 1) following up on the requests for the information required by Section 1.8 of the SPA, 2) reiterating that the purported Claim Notice had not been delivered in accordance with the SPA and 3) stating that the Escrow Deposit should be released immediately.

48.     On November 26, 2019, in an email, Defendant, through Paterniti, rejected Shareholder Representatives' requests for information.

**First Earnout Statement**

49.    On January 15, 2020, Mr. Barnard corresponded to Defendant, as follows:

a.    Following up on the September 10, 2019 request for information;

b.    Requesting a full company organizational chart highlighting any and all employees, contractors, or consulting resources present in the Company during the Y1 Earnout Period, highlighting which of those resources were specifically dedicated 100% to executing Company's operating plan at any time during the Y1 Earnout Period per Section 1.8(a) of the SPA, versus ongoing integration efforts with other Marchex controlled entities;

c.    Reminding Defendant that Plaintiffs were still not in receipt of the funds from escrow that were due pursuant to the SPA.

50.    Subsequent to this request, Defendant sent a January 16, 2020 Earnout Statement ("First Earnout Statement") for the Y1 Earnout Period. The First Earnout Statement purported to reflect that the Earnout Consideration was not payable for the Y1 Earnout Period.

51.    On January 17, 2020, Mr. Barnard corresponded to Defendant, reiterating the requests for information. Mr. Barnard pointed out that the First Earnout Statement contained confidential information which would be appropriately treated as such by the Shareholder Representatives. Mr. Barnard's correspondence further pointed out that confidentiality was not a valid reason or basis for withholding information, as the First Earnout Statement itself contained confidential information.

52.    On January 24, 2020, Paterniti, on behalf of Defendant, distributed to Plaintiffs, by email, a one-page document to serve as "additional detail" in support of the First Earnout

Statement. Paterniti took the position that the various types of information requested by Plaintiffs, relating to the operations of Telmetrics, were "inappropriate."

53.    On February 1, 2020, Shareholder Representatives, through counsel, sent a written notice to Defendant to advise that Defendant was in breach of §1.8(b) of the SPA in that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with the First Earnout Statement. This correspondence further advised that the Shareholder Representatives disagreed with the First Earnout Statement and that the Shareholder Representatives did not accept the First Earnout Statement with respect to the Y1 Earnout Period.

54.    The February 1, 2020 correspondence further reiterated Shareholder Representatives' request for information dated September 10, 2019 and January 15, 2020. As stated in the correspondence, Defendant had failed to provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2019 conclusion of the Y1 Earnout Period. As explained in the February 1, 2020 correspondence, the information had been requested by the Shareholder Representatives in order to enable them to evaluate the financial results set out in the First Earnout Statement, whether the business of the Company had been carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner, as required by §1.8(a) of the SPA.

55.    Defendant did not respond to Plaintiffs' information requests, did not work in good faith to resolve the disagreements with Plaintiffs, and conducted itself in a manner which effectively rendered it impossible and pointless to engage a Final Accounting Firm to resolve the disagreements, as the parties had agreed to do Section 1.8(c) of the SPA.

**Second Earnout Statement**

56.     On January 14, 2021, Defendant sent an Earnout Statement for the Y2 Earnout Period ("Second Earnout Statement").[4] The Earnout Statement purported to reflect that the Earnout Consideration was not payable for the Y2 Earnout Period.

57.     On January 18, 2021, Plaintiffs' counsel notified Defendant, through counsel, of the following:

    a.  That Plaintiffs disputed the Second Earnout Statement with respect to the Y2 Earnout Period;

    b.  That Defendant remained in breach of the SPA for failing to provide information reasonably requested by the Shareholder Representatives in connection with the Y1 Earnout Period;

    c.  That Defendant risked a second and distinct breach of the SPA with respect to information reasonably requested by Shareholder Representatives and required in order to evaluate the Second Earnout Statement. Specifically, the information requests made on September 10, 2019, January 15, 2020 and February 1, 2020 were required in order to evaluate the financial results set out in both the First and Second Earnout Statements and to follow up with additional specific and reasoned information requests;

    d.  That the information requested by the Shareholder Representatives was required to evaluate the financial results set out in both the First and Second Earnout Statements, which were necessarily impacted by whether the business of the

---

[4] The correspondence from Defendant was mistakenly dated January 14, 2020, despite the fact that the correspondence was actually dated January 14, 2021.

Company was carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner with respect to the Company's business as required by Section 1.8(a) of the SPA;

e.  That information requests had been made September 10, 2019, January 15, 2020, February 1, 2020 – but to no avail. Plaintiffs' counsel again reiterated these requests.

58.  Defendant refused to work in good faith to resolve the disagreements with Plaintiffs regarding Plaintiffs' disagreement over the First and Second Earnout Statements. In doing so, Defendant rendered it pointless for the parties to retain a Final Accounting Firm to resolve the disagreements, as contemplated by Section 1.8(c) of the SPA.

59.  Short of obfuscation and denial, Defendant did not offer at any time any response to requests for information requests beyond that which was contained in the First and Second Earnout Statements.

60.  While Shareholder Representatives attempted to comply with their responsibilities under the SPA, Defendant, knowingly and in bad faith, withheld information reasonably requested by Shareholder Representatives.

61.  As a result of Defendant's misconduct, Shareholder Representatives were provided with no bases on which to either declare agreement with or to construct alternative versions of each of the First and Second Earnout Statements – rendering them without any information to submit to a Final Accounting Firm, had Defendant even retained a Final Accounting Firm (which Defendant did not). Effectively, Defendant's misconducted rendered the exercise of retaining a Final Accounting Firm useless and without any value.

**The Escrow Deposit**

62.     As primary security for Shareholders' indemnification obligations under Article X of the SPA, Marchex was required to deposit $1,010,000.00 in escrow (the "Escrow Deposit") on behalf the Shareholders. *See* SPA, §1.5. The Escrow Deposit was to be held and eventually disbursed by an escrow agent (U.S. Bank National Association) ("Escrow Agent") and disbursed in accordance with the terms of the Escrow Agreement[5] and the SPA. *See* SPA, §1.5.

63.     The Escrow Deposit was to be held until the "Escrow Release Date," the 18th month anniversary of the Closing Date, or May 5, 2020. *See* SPA, §1.5 SPA, p. 56.

64.     The SPA (p. 56) and the Escrow Agreement (§3.1) further provided that in the event that there were no escrow claims during the first 12 months following the November 15, 2018 Closing Date, that the Escrow Deposit would be reduced to $250,000.00 and that $760,000.00 would be promptly delivered to the Shareholders via the Shareholder Representatives.

65.     Alternatively, in the event that a Claim Notice *was* validly delivered in accordance with the SPA, the SPA provided that in such a circumstance, the Escrow Deposit was to remain in the custody of the Escrow Agent for so long as was reasonably necessary to satisfy any claim for indemnification.

66.     Pursuant to Section 3.6 of the Escrow Agreement, any disputes regarding an "Indemnifiable Matter" were to be settled in accordance with the Share Purchase Agreement.

67.     On November 1, 2019, Defendant circulated a "claim" (dated November 1, 2019), listing various SPA indemnity references and vague claim descriptions, concluding with Defendant's unsupported and speculative estimate that the total "claim" amount would be in

---

[5] The Escrow Agreement is attached to the SPA as Exhibit C.

excess of $760,000. Defendant provided no detail or support for the estimate. On November 4, 2019, Paterniti sent an email to McEvenue and Barnard, attaching the purported claim letter.

68.    On November 10, 2019, Mr. Barnard, on behalf of Plaintiffs, advised Defendant that the November 1, 2019 letter did *not* constitute a valid Claim Notice under the SPA, pointing out that Defendant's November 1, 2019 letter had only described vague or possible losses that "may" occur in the future and that Defendant had not provided any of the requisite information required by the SPA or to justify withholding any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA) be released.

69.    On December 23, 2019, Mr. Barnard corresponded to the Escrow Agent, U.S. National Bank ("Escrow Agent"), to advise U.S. National Bank that no amount of the Escrow Deposit was to be released to Defendant.

70.    That same day, the Escrow Agent responded to Mr. Barnard, confirming receipt of his correspondence and stating that the funds would remain in escrow until the claim was jointly resolved by the parties.

71.    Several weeks later, on January 14, 2020, the Escrow Agent emailed Mr. Barnard, stating that the Escrow Agent was *now* taking the position that the Escrow Agent had not received a dispute in compliance with the Escrow Agreement.

72.    Thereafter, on February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. National Bank, demanding that the Escrow Agent send the disputed $760,000.00 to *Defendant*. However, Defendant deliberately delivered this request by hand to the Escrow Agent, and only sent it to the Shareholder Representatives by mail, knowing full well that there would

be a considerable delay between the hand-delivered notice and the notice by mail, intentionally and effectively depriving the Shareholder Representatives of the ability to respond.

73.    As intended by Defendant, the Shareholder Representatives did not receive the February 3, 2020 demand by Defendant until *February 13, 2020*. The Escrow Agreement provided that all notices and communications under the Escrow Agreement are deemed given *when* received. *See* Escrow Agreement, §6.3. Thus, Defendant's February 3, 2020 was not given to the Shareholder Representatives until February 13, 2020.

74.    Defendant's scheme worked. The Shareholder Representatives received Defendant's correspondence demanding release of the $760,000.00 from the Escrow Deposit on February 13, 2020, *ten days* after the $760,000.00 had already been improperly released to Defendant by U.S. National Bank.

75.    On February 14, 2020, one day after receipt, Plaintiffs' counsel again notified both the Escrow Agent and Defendant that the original November 1, 2019 letter was *not* a valid "Claim Notice" and that Plaintiffs did *not* agree to the release of the Escrow Deposit.

76.    Plaintiffs' counsel's correspondence noted, among other things, that Defendant had delivered an invalid Claims Notice, that Plaintiffs had communicated their position that the Claims Notice was invalid to Defendant on November 10, 2019, and that the Escrow Deposit should have been released to the *Shareholder Representatives* on the Escrow Release Date. Accordingly, Defendant's demand for a release of the Escrow Deposit in the face of a dispute with respect to the validity of the Claims Notice was improper.

77.    Plaintiffs' counsel's February 14, 2020 correspondence further pointed out that the Escrow Agent is required to have a written agreement signed by both Plaintiffs and

Defendant for any release of the Escrow Deposit, or a final decision with respect to the alleged Indemnifiable Matters in order to release the Escrow Deposit.

78.      Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

79.      On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had already sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

80.      On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

81.      On May 1, 2020, Defendant's counsel sent to the Shareholder Representatives an "Updated Claim Notice" – demanding that the Escrow Agent retain the remaining $250,000.00 of the Escrow Deposit.

82.      On May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, demanding immediate release of the remaining $250,000.00 of the Escrow Deposit and reserving the previous dispute regarding the improper release of the $760,000.00 to Defendant.

83.      On May 5, 2020, Plaintiffs' counsel sent an additional letter to Defendant, directly disputing the May 1, 2020 "Updated Claim Notice" and noting that the "Updated Claim Notice" - like the November 1, 2019 letter - was not a valid claim notice due to the fact that it merely vaguely referenced possible losses that "may occur" and did not refer to any "losses" within the meaning of the SPA. This correspondence also pointed out that Defendant had failed to provide the required relevant information or a good faith estimate of the reasonably foreseeable maximum amount of the alleged claims.

84.    In the absence of agreement and joint instruction by the parties, in order to be entitled to any amount of the Escrow Deposit, Defendant was required to obtain a final determination of its rights with respect to the Escrow Deposit, as set forth in the Escrow Agreement. Defendant has not done so.

85.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent.

86.    Defendant's conduct with respect to the Escrow Deposit constitutes a breach of Defendant's obligations under the SPA and the Escrow Agreement.

87.    Defendant not only wrongfully caused the Escrow Agent to withhold the escrow funds to satisfy claims for indemnification, but Defendant wrongfully caused the Escrow Agent to release $760,000.00 to *Defendant*, in breach of Section 1.5 of the SPA and in breach of the Escrow Agreement.

88.    Defendant's breaches of the SPA and the Escrow Agreement have further damaged Plaintiffs, who are entitled to be paid the entire Escrow Deposit, in the amount of $1,010,000.00.

89.    Defendant's scheme to obtain a portion of the Escrow Deposit, without any notice to the Shareholder Representatives and without establishing entitlement to such funds was underhanded and in bad faith.

## COUNT I

## BREACH OF CONTRACT (SPA)

90.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

91.     The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

92.     Plaintiffs performed all of their obligations under the SPA.

93.     Defendant breached several of its obligations under the SPA, as detailed herein.

### *Defendant's Breach of Section 1.8(a) of the SPA*

94.     Pursuant to Section 1.8(a), of the SPA, Defendant was obligated to act in a good faith or commercially reasonable manner with respect to the operation of the Company's business. Specifically, Section 1.8(a) provided as follows:

> 1.8    Earnout.
>
>         (a)     Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

95.     Defendant breached Section 1.8(a) of the SPA.

96.     Defendant's conduct, in breach of these obligations, included but is not limited to:

   a.   Defendant's failure to act in a commercially reasonable manner with respect to the operation of the Company's business.

    b.   The fact that Defendant, through its employees and agents, operated the Company's business in bad faith with the principal purpose of avoiding the payment of the Earnout Consideration due to the Shareholders under the SPA and to have a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

    c.   Defendant's failure to manage the Company's business plan;

    d.   Defendant's failure to put into place a CEO after the departure of Andrew Osmak for medical leave.

### ***Defendant's Breach of Section 1.8(b) of the SPA***

97.    Pursuant to Section 1.8(b), of the SPA, Defendant was obligated to provide Plaintiffs, no later than 75 days following the conclusion of each Earnout Period, a statement regarding the performance of certain financial goals and other documents as Plaintiffs would reasonably request. Specifically, Section 1.8(b) provided as follows:

> (b)    The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request. For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

98.    Following the conclusion of the Y1 Earnout Period, which concluded on November 5, 2019, Plaintiffs requested information from Defendant, consistent with Section 1.8(b) of the SPA.

99.    Defendant breached Section 1.8(b) of the SPA by refusing to provide the reasonably requested information.

### *Defendant's Breaches of Section 1.8(c) of the SPA*

100.    As set forth above, Defendant was obligated, pursuant to §1.8(c) of the SPA, to give Plaintiffs reasonable access to books and records and working papers of Company to enable the Shareholder Representatives to exercise their rights under Section 1.8 of the SPA.

101.    Defendant breached §1.8(c) of the SPA by refusing to provide Shareholders with reasonable access to books and records and working papers of Company to enable Plaintiffs to exercise their rights under the SPA, including but not limited to the right to be presented with information in conjunction with the Earnout Statement, as contemplated in §1.8(b) of the SPA.

102.    By refusing to provide Plaintiffs with reasonable access to books and records and working papers of Company, Defendant rendered pointless the process of retaining a "Final Accounting Firm," which was expressly designated as the method for resolving disputes under the SPA.

### *Defendant's Breach of Section 1.8(e) of the SPA*

103.    Pursuant to Section 1.8(e) of the SPA, upon the occurrence of an Acceleration Event (defined in the SPA), Defendant would be obligated to make certain payments to Plaintiffs. Section 1.8(e) of the SPA provides the following:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then, following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the applicable Earnout Period.

104.    On page 53 of the SPA, an "Acceleration Event" was defined, as set forth below:

"*Acceleration Event*" means any of the following: (a) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in connection with the first Earnout Period has been earned as a result of achieving the applicable Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not resigned without Good Reason or been terminated for Cause and the Parent reduces the Company's workforce to less than 35 employees without consent of the Shareholder Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or (e) the Company becomes subject to wind-up, liquidation or dissolution.

105.    Specifically, upon information and belief, while Andrew Osmak was employed with the Company, on a date better known to Defendant, Defendant reduced the Company's workforce to less than 35 **employees** without the consent of the Shareholder Representatives. Plaintiffs have reached this conclusion based on a reasonable interpretation of publicly available information regarding the Company. Defendant was made aware of this challenge and disputed it. Defendant, however, refused Plaintiffs' request for documentation to ascertain the validity of its dispute.

106.    Defendant's reduction of the Company's workforce to less than 35 employees without the consent of the Shareholder Representatives constituted an Acceleration Event.

107.    Defendant breached Section 1.8(e) by failing to make the payments as required due to the occurrence of the Acceleration Event.

108.    Payment pursuant to Section 1.8(e) was either due within 90 days of November 5, 2019 (or February 3, 2020) or within 90 days of November 5, 2020 (of February 3, 2021), depending on *when* Defendant reduced the Company's workforce to less than 35 employees without consent of the Shareholder Representatives.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows:

a. Awarding actual, compensatory, punitive and other damages, as a result of Defendant's breaches of the SPA, in an amount to be determined at trial and in excess of $75,000.00, together with attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper;

b. A judicial declaration as follows:

   i. Defendant's reduction of the Company's workforce to less than 35 employees without the consent of the Shareholder Representatives constituted an Acceleration Event;

   ii. That due to the fact that an Acceleration Event occurred, that Defendant is entitled to be paid in accordance with the terms of the SPA.

c. Ordering specific performance, as allowable by the SPA, as follows:

   i. Compelling Defendant to produce information to Plaintiffs, consistent with Defendant's obligations pursuant to 1.8(b) of the SPA;

   ii. Compelling Defendant to provide Plaintiffs with access to books and records, consistent with Defendant's obligations pursuant to 1.8(c) of the SPA.

## COUNT II

## DECLARATORY JUDGMENT

109.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein at length.

110.    This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201.

111.    Further, this Court can provide the declaratory relief sought in this action because an actual case and controversy exists between the parties within the scope of this Court's jurisdiction.

112.    As detailed above, pursuant to the SPA and the Escrow Agreement (which was attached as Exhibit C to the SPA), an aggregate of $1,010,000.00 was held in escrow by the Escrow Agent, to be released to Shareholders eighteen months after the November 5, 2018 Closing Date.

113.    Pursuant to the SPA and Article III of the Escrow Agreement, Defendant was permitted to offset the amount of any indemnification claims against the escrow funds. In the absence of any such claims, however, in the first 12 months following the Closing, the Escrow Deposit was to be reduced to $250,000 – and the Shareholders were to receive the $760,000.00.

114.    On November 1, 2019, Defendant circulated a "claim" (dated November 1, 2019), listing various SPA indemnity references and vague claim descriptions, concluding with their estimate that the total "claim" amount would be in excess of $760,000. Since that date Defendant has not provided any detail or support for that estimate. On November 4, 2019, Paterniti sent an email to McEvenue and Barnard, attaching the claim letter.

115.    On November 10, 2019, Mr. Barnard, Plaintiffs advised Defendant that the November 1, 2019 "claim" did *not* constitute a valid Claim Notice, as that term is defined in the SPA, due to the fact that Defendant's November 1, 2019 letter had only described vague or possible losses that "may" occur in the future and that Defendant had not provided any of the requisite information relevant to a claim to comply with the SPA or entitle them to withhold any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA) be released.

116.    On December 23, 2019, Mr. Barnard corresponded to U.S. Bank, advising U.S. National Bank that no amount of the Escrow was to be released to Defendant. That same day the Escrow Agent responded to Mr. Barnard, confirming receipt of Mr. Barnard's correspondence and stating that the funds would remain in escrow until the claim was jointly resolved by the parties.

117.    Thereafter, on January 14, 2020, the Escrow Agent emailed Mr. Barnard, stating that in actuality, the Escrow Agent was taking the position that the Escrow Agent had not received a dispute in compliance with the Escrow Agreement.

118.    Thereafter, on February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. National Bank, demanding that the Escrow Agent send the disputed $760,000.00 to *Defendant*. However, as described above, Defendant deliberately delivered this request by hand to the Escrow Agent, and mailed it to the Shareholder Representatives, knowing full well that there would be a considerable delay between the hand-delivered notice and the notice by mail such that the Shareholder Representatives would not have the ability to respond.

119.    On February 14, 2020, Plaintiffs' counsel notified both the Escrow Agent and Defendant that the Claims Notice was not valid and that Plaintiffs did not agree to the release of the Escrow Deposit. This correspondence noted, among other things, that Defendant had delivered an invalid Claims Notice dated November 1, 2019, that Plaintiffs had communicated their position that the Claims Notice was invalid to Defendant on November 10, 2019, that the Escrow Deposit should have been released to the Shareholder Representatives on the Escrow Release Date and that it was improper for Defendant to demand release of the Escrow Deposit in the face of a dispute with respect to the validity of the Claims Notice. This correspondence further pointed out that the Escrow Agent is required to have a written agreement signed by both

Plaintiffs and Defendant for any release of the Escrow Deposit, or a final decision with respect to the alleged Indemnifiable Matters in order to be in a position to release the Escrow Deposit. Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

120.    On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

121.    On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

122.    Specifically, Section 3.3 of the Escrow Agreement does not provide for the release of any amount to Defendant in an absence of a determination with respect to an indemnification claim by Defendant. No such claim has been validly made, no document-supported claim has been advanced by Defendant and certainly no determination has been made.

> 3.3    Claims Not Disputed by Company and/or the Shareholder Representatives. If, within thirty (30) days after the Escrow Agent's receipt of the notice described in Section 3.2 hereof, the Shareholder Representatives have not given the Escrow Agent the notice provided for in Section 3.4 hereof, the Parent shall be entitled to make demand upon the Escrow Agent that it retain for future return to the Parent as and when the amount is determined pursuant to the provisions hereof, if it is not then determined, or that it then disburse to the Parent, if it has then been determined, an amount of the Escrow Deposit having a value equal to the lesser of (i) the full amount set forth in the notice described in Section 3.2 or (ii) the entire Escrow Deposit. The Escrow Agent may conclusively rely on any such Parent demand.

*See* Escrow Agreement, Section 3.3.

123.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent.

124.    Pursuant to Section 3.6 of the Escrow Agreement, any disputes regarding an "Indemnifiable Matter" were to be settled in accordance with the SPA.

125.    Defendant's conduct with respect to the aforementioned escrow funds constitutes a breach of Defendant's obligations under the SPA and the Escrow Agreement.

126.    Defendant has not only wrongfully caused the Escrow Agent to withhold the escrow funds to satisfy claims for indemnification, but Defendant wrongfully caused the Escrow Agent to release $760,000.00 to *Defendant*, in breach of Section 1.5 of the SPA.

127.    Thereafter, on May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the remaining $250,000.00 in escrow was to be released to Plaintiffs, in addition to the $760,000.00 which should have been released to Plaintiffs on November 5, 2019.

128.    There exists a real, live, immediate and justiciable case or controversy between Plaintiffs and Defendant regarding the entitlement of the Escrow Deposit.

129.    The parties are in need of a declaratory judgment declaring their rights and obligations to the Escrow Deposit under the SPA and the Escrow Agreement.

130.    Plaintiffs seeks a judicial declaration with respect to their entitlement to the Escrow Deposit under the SPA and the Escrow Agreement.

**WHEREFORE**, Plaintiffs request that the Court enter a declaratory judgment in their favor and against Defendant, declaring as follows:

a.  That Defendant's November 1, 2019 "claim" did not constitute a valid Claim Notice;

b.  That the $760,000.00.00 sent by the Escrow Agent to Defendant should have been released to Plaintiffs;

c.  That the Escrow Agent should *not* have sent the $760,000.00 to Defendant;

d.  That Plaintiffs are entitled to an immediate return of the $760,000.00 from the Escrow Deposit that was wrongfully released to Defendant;

e.   That Defendant's May 1, 2020 "Updated Claim Notice" did not constitute a valid Claim Notice;

f.   That Plaintiffs are entitled to an immediate release of the $250,000.00 currently held by the Escrow Agent;

g.   That as a result of its wrongful misconduct and breaches of the SPA and Escrow Agreement, as detailed herein, that Defendant is liable to Plaintiffs for all actual, compensatory, punitive and other damages, including but not limited to interest earnings, in an amount to be determined at trial and in excess of $75,000.00, together with attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper;

## COUNT III

## CONVERSION

131.   Plaintiffs hereby adopt and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.   As set forth herein, Defendant caused U.S. National Bank to release $760,000.00 from the Escrow Deposit which should have either been released to Plaintiffs or alternatively, held by Escrow Agent.

133.   Defendant was not entitled, either under the Escrow Agreement or under any basis, to take possession of the $760,000.00.

134.   Defendant's orchestration of the delivery of a portion of the Escrow Deposit to the Defendant without any notice to the Shareholder Representatives and without any establishment of entitlement to such funds was underhanded and plainly in bad faith.

135.    The money transferred to Defendant was expressly for the benefit of, and rightfully belonged to Plaintiff, and Defendant did not have the right to cause the Escrow Agent to divert or transfer that money to Defendant.

136.    In doing so, Defendant intentionally and improperly deprived Plaintiffs of their money and the expected benefits thereof, effectively stealing that money from Plaintiffs, for its own purpose.

137.    An action for conversion of money will lie where there is an obligation to return the identical money delivered to Defendant.

138.    The money that Defendant converted for its own use was a specific chattel because there is an obligation to return the identical money that Defendant wrongfully caused the Escrow Agent to deliver.

139.    Plaintiffs did not consent to Defendant's conversion.

140.    As a direct and proximate result of Defendant's conversion, Plaintiffs were damaged, in an amount in excess of $75,000.00.

    **WHEREFORE**, Plaintiffs demands judgment in excess of $75,000.00, the value of the funds at the time that Defendant took possession of the money, interest from the time that Defendant wrongfully converted the property, and punitive or exemplary damages due to Defendant's intentional, oppressive and malicious conduct in unlawfully converting the aforementioned money.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendant as follows:

a) The issuance of a preliminary injunction and thereafter a permanent injunction as follows:

    i. Compelling Defendant to immediately return all funds wrongfully received from the Escrow Agent;

    ii. Enjoining Defendant from further requesting that funds be transferred to Defendant from the Escrow agent;

b) Damages, declaratory relief and specific performance, as set forth in Count I;

c) Declaratory relief and damages, as set forth in Count II;

d) Damages, for conversion, as set forth in Count III;

e) Judgment in favor of Plaintiffs, in their capacity as Shareholder Representatives, for damages in excess of $75,000.00, including actual, compensatory, direct, indirect and punitive damages, plus pre- and post- judgment interest thereon, against Defendant, for all damages proximately caused by Defendant, as set forth herein;

f) A judgment declaring that:

    i. Defendant's misconduct constitutes a violation of the SPA;

    ii. Defendant is obliged to perform all obligations under the SPA;

      iii.    Defendant's wrongful conversion of funds from the Escrow Deposit warrants and justifies the imposition of a constructive trust on all funds wrongfully transferred;

      iv.    Defendant shall return all wrongfully converted funds to Plaintiffs; and

      v.    Defendant is liable to Plaintiffs for all damages proximately caused by its misconduct and willful violation of its contractual and extracontractual duties to Plaintiff.

g) Awarding the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

h) Granting such other and further relief as the Court may deem just and proper.

**GARIBIAN LAW OFFICES, P.C.**

/s/ Antranig Garibian
Antranig Garibian, Esquire (Bar No. 4962)
1010 N. Bancroft Parkway, Suite 22
Wilmington, DE 19805
(302) 722-6885
ag@garibianlaw.com
*Counsel for Plaintiffs*