**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CHRIS BARNARD and SINC MCEVENUE, in their capacity as the Shareholder Representatives for the former shareholders of Telmetrics Inc.,** | : : : : : | **C.A. NO. 1:22-cv-01382-RGA** |
| Plaintiffs, | : : | |
| **v.** | : : | |
| **MARCHEX, INC.** | : : | |
| Defendant. | : : | |

### AMENDED COMPLAINT

Plaintiffs, Chris Barnard and Sinc McEvenue, in their capacity as Shareholder Representatives of the former shareholders of Telmetrics Inc. ("Telmetrics") under the November 5, 2018 Share Purchase Agreement ("SPA") between Marchex, Inc. ("Marchex" or "Defendant"), Marchex CA Corporation, a Nova Scotia corporation (a wholly-owned subsidiary of Marchex), Telmetrics, a corporation formed pursuant to the laws of the Province of Nova Scotia (the "Company"), by way of this Amended Complaint, bring this action against Marchex, Inc. ("Marchex") and allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs (also referred to as "Shareholder Representatives") assert claims against Marchex on behalf of the former shareholders of Telmetrics ("Shareholders"), in Plaintiffs' capacity as Shareholder Representatives, for Defendant's breaches of the SPA and for Defendant's misconduct, as identified herein.

2.      Shareholders and Shareholder Representatives have suffered and continue to suffer damages as a direct and proximate result of Defendant's misconduct, breaches of the SPA, breaches of an escrow agreement ("Escrow Agreement") and abuse of judicial process.

1

3.      In this action, Plaintiffs seek relief resulting from Defendant's misconduct under the SPA and the Escrow Agreement.

## PARTIES

4.      Plaintiffs, Chris Barnard and Sinc McEvenue, are Shareholder Representatives of the former shareholders ("Shareholders") of Telmetrics, Inc. ("Telmetrics" or "Company") under the SPA.

5.      Pursuant to §6.3 of the SPA, Plaintiffs have been  designated as Shareholder Representatives and in that capacity, are vested with the power to transact matters of litigation on behalf of Shareholders in connection with the SPA.

6.      Chris Barnard is a citizen of Canada.

7.      Sinc McEvenue is a citizen of Canada.

8.      Marchex Inc. is a Delaware corporation and is a citizen of the state of Delaware.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00[1], exclusive of interest and costs.

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(3). Plaintiffs' claims arise out of the SPA, which provides that any action or proceeding arising under or in connection with the SPA shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware. *See* SPA, §11.10.

---

[1] All dollar amounts referenced in this Amended Complaint are expressed in United States currency.

11.     Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions to enforce the terms of the SPA and irrevocably waived any objection to personal jurisdiction in Delaware. *See* SPA, §11.10.

12.     Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions to enforce the terms of the Escrow Agreement and irrevocably waived any objection to personal jurisdiction in Delaware. *See* Escrow Agreement, §§3.6, 6.5.

13.     In addition to seeking money damages, the SPA authorized Plaintiffs to seek specific performance and/or injunctive and/or equitable relief without the necessity of posting a bond or proving actual damages:

> 11.12  Specific Performance.  In addition to any and all other remedies that may be available at Law in the event of any breach of this Agreement, the parties hereto shall be entitled to specific performance of the agreements and obligations hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction, without the necessity of posting a bond or proving actual damages.

*See* SPA, §11.12.

## FACTUAL BACKGROUND

14.     This case arises out of Defendant's pervasive, blatant and egregious misconduct towards the Shareholder Representatives and Shareholders[2] since the November 5, 2018 closing of the SPA.

15.     Defendant has brazenly disregarded its obligations, acted with impunity and refused to conduct itself in good faith. As a result of Defendant's misconduct, Plaintiffs have been left with no choice but to file this action.

---

[2] In §12.1 of the SPA, the term "Seller" is defined as having the meaning set forth in the preamble to the SPA. The preamble to the SPA defines the Shareholders as those individuals listed on Exhibit A to the SPA and references each of them individually as "Seller." Accordingly, for purposes of this Amended Complaint, the terms "Shareholders" and "Sellers" shall refer to the Shareholders listed on Exhibit A to the SPA.

### *November 5, 2018 SPA*

16.    Marchex is a Seattle-based public company specializing in B2B call and conversation analytics. Marchex's business, in part, involves the use of artificial intelligence and machine learning to analyze conversation data between businesses and customers, providing customers with reporting designed to measure, among other things, the effectiveness of marketing programs.

17.    Telmetrics was similarly engaged in the analysis of conversation data between businesses and their customers for the purpose of assisting its clients in evaluating the effectiveness of their advertising campaigns.

18.    Marchex acquired Telmetrics for the purpose of adding Telmetrics' strength to Marchex's existing platform. This acquisition was accomplished through the November 5, 2018 SPA.

19.    The SPA closed on November 5, 2018 (the "Closing Date").

20.    Pursuant to the SPA, the purchase price of Telmetrics ("Purchase Price") was comprised of the following:

    a.    $10,100,000.00 as upfront cash consideration (the "Upfront Cash Consideration");

    b.    Up to $3,000,000.00 in cash based upon the achievement of targeted financial goals over two twelve-month periods (each, an "Earnout Period") following the closing date of the SPA (the "Earnout Consideration").

21.    The SPA defined the "Earnout Periods" as follows:

    a.    The first twelve months following the November 5, 2018 Closing Date (referred to herein as "First Earnout Period");

     b.   The second twelve months following the November 5, 2018 Closing Date (referred to herein as "Second Earnout Period").

22.     Within ninety (90) days after the end of the First Earnout Period, Defendant was required to pay the Earnout Consideration ($1,250,000.00) for the First Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA. *See* SPA, §1.2(b).

23.     Within ninety (90) days after the end of the Second Earnout Period, Defendant was required to pay the Earnout Consideration ($1,750,000.00) for the Second Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA. *See* SPA, §1.2(b).

***Acceleration Events***

24.     On page 53 of the SPA, the SPA defined an "Acceleration Event" as any number of events, as set forth below:

> "***Acceleration Event***" means any of the following: (a) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in connection with the first Earnout Period has been earned as a result of achieving the applicable Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not resigned without Good Reason or been terminated for Cause and the Parent reduces the Company's workforce to less than 35 employees without consent of the Shareholder Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or (e) the Company becomes subject to wind-up, liquidation or dissolution.

25.     Upon the occurrence of an Acceleration Event, §1.8(e) of the SPA provided as follows:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then, following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the applicable Earnout Period.

26.    If an Acceleration Event occurred during the First Earnout Period, Defendant was obligated to pay, or cause to be paid, to Plaintiffs an aggregate cash amount of $3,000,000.00, within 90 days of November 5, 2019 (or February 3, 2020). *See* SPA, §1.2(e).

27.    If an Acceleration Event occurred during the Second Earnout Period, Defendant was obligated to pay, or cause to be paid, to Plaintiffs an aggregate cash amount of $1,750,000.00, within 90 days of November 5, 2020 (of February 3, 2021). *See* SPA, §1.2(e).

### Marchex's Obligations Regarding the Operation of the Company

28.    Pursuant to §1.8(a) of the SPA, Marchex was obligated to:

    a.    Act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business;

    b.    Cause each of its subsidiaries not to, and require each of its respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business in bad faith with the principal purpose of (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period or (ii) having a material direct negative effect on the Company's revenue or OIBA[3] for purposes of achieving the Financial Goals.

29.    Specifically, §1.8(a) provided as follows:

---

[3] "OIBA" is defined in Exhibit B to the SPA as "operating income before amortization."

> 1.8    Earnout.
>
> (a)    Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

### *Earnout Statements*

30.    Pursuant to §1.8(b) of the SPA, no later than 75 days following the conclusion of each Earnout Period, Defendant was obligated to prepare and deliver the following to Plaintiffs:

a.    An "Earnout Statement" (specifically defined in the SPA as a "statement calculating whether Financial Goals have been achieved");

b.    such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.

31.    Specifically, §1.8(b) of the SPA provided as follows:

> (b)    The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.  For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

32.    In the event of a disagreement with an Earnout Statement by Plaintiffs, Marchex was obligated to give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its "Subsidiaries" and their accountants to enable the Shareholder Representatives to exercise their rights under §1.8. *See* SPA, §1.8(c).

33.    Further, with respect to a disagreement over an Earnout Statement, Marchex and the Shareholder Representatives were obligated to attempt to resolve any agreements over an Earnout Statement in good faith. *See* SPA, §1.8(c).

34.    Section 1.8(c) provided as follows:



(c)    If the Shareholder Representatives disagree with an Earnout Statement, the Shareholder Representatives shall notify the Parent on or before the date fifteen (15) days after the date on which the Parent delivers to the Shareholder Representatives such Earnout Statement, failing which such Earnout Statement shall be deemed to be accepted by the Sellers with respect to the corresponding Earnout Period.  The Parent and the Buyer shall give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under this Section 1.8.  The Parent and the Shareholder Representatives shall attempt to resolve any such disagreements in good faith.  If the

5

CAN: 28618682.8

Parent and the Shareholder Representatives are unable to resolve all such disagreements on or before the date fifteen (15) days following notification by the Shareholder Representatives of any such disagreements, the Parent shall retain the Final Accounting Firm to resolve all such disagreements, who shall adjudicate only those items still in dispute with respect to the Earnout Statement.

35.    If a dispute over an Earnout Statement could not be resolved on or before the date 15 days following notification by the Shareholder Representatives of any such disagreements, **Defendant** was obligated to retain an accounting firm ("Final Accounting Firm") for the sole purpose of resolving disagreements over the Earnout Statement. *See* SPA, §1.8(c).

36.    Per Section 1.8(c) of the SPA, the Defendant was obligated to retain the Final Accounting Firm for one sole and limited purpose - to *"only adjudicate those items still in dispute with respect to the Earnout Statement."*

### *The Escrow Agreement*

37.     As primary security for Shareholders' indemnification obligations under Article X of the SPA, Marchex was required to deposit $1,010,000.00 in escrow (the "Escrow Deposit") on behalf the Shareholders. *See* SPA, §1.5. The Escrow Deposit was to be held and eventually disbursed to Plaintiffs by an escrow agent (U.S. Bank National Association) ("Escrow Agent") in accordance with the terms of a separate agreement ("Escrow Agreement")[4] and the SPA. *See* SPA, §1.5.

38.     The Escrow Deposit was to be held until the "Escrow Release Date," the 18th month anniversary of the Closing Date, or May 5, 2020. *See* SPA, §1.5, SPA, §12.1.

39.     The SPA (§12.1) and the Escrow Agreement (§3.1) further provided that in the event that there were no escrow claims during the first 12 months following the November 5, 2018 Closing Date, that the Escrow Deposit would be reduced to $250,000.00 and that $760,000.00 would be promptly delivered to the Shareholders via the Shareholder Representatives.

40.     Alternatively, in the event that a Claim Notice *was* validly delivered in accordance with the SPA, the SPA (§1.5) and Escrow Agreement provided merely that in such a circumstance, the Escrow Deposit was to remain in the custody of the Escrow Agent for so long as was reasonably necessary to satisfy any claim for indemnification.

41.     Pursuant to §3.6 of the Escrow Agreement, any disputes regarding an "Indemnifiable Matter" were to be settled in accordance with the Share Purchase Agreement.

42.     Under §3.7 of the Escrow Agreement, where a Claim notice referenced Indemnifiable Matters that were not absolute as to liability or liquidated as to amount, as a

---

[4] The Escrow Agreement is attached to the SPA as Exhibit C.

condition precedent to withholding funds related to any such claims, Defendant was required to send a "Notice to Withhold" to the Escrow Agent and the Shareholder Representatives to notify the Escrow Agent and the Shareholder Representatives of the amount, if any, to be retained after the Escrow Release Date on account of Indemnifiable Matters concerning which Defendant has given the notice specified in §3.2 of the Escrow Agreement.

43.    If there *were* escrow claims during the First Earnout Period, the Escrow Agreement (§3.1), provided that after the First Earnout Period, the Escrow Agent would reduce the Escrow Deposit to $250,000.00, plus such amount in consideration of the amount set forth in a notice delivered pursuant to §3.2 **and** as reasonably required as provided in §3.7 of the Escrow Agreement. Any balance was required to be released *promptly* to the Shareholder Representatives. *See* Escrow Agreement, §3.1.

44.    Per §3.7 of the Escrow Agreement, in the event that Defendant "does not provide the notice required by this Section 3.7, (a) all claim notices received by Sellers or the Escrow Agent from [Marchex, Inc.] pursuant to Section 3.2 shall be void and of no further effect and (b) all remaining funds held in the Escrow Deposit shall be distributed by the Escrow Agent to the Shareholder Representatives promptly after the Escrow Release Date in accordance with Section 3.8 notwithstanding any previously received claim notice given by [Marchex, Inc.] pursuant to Section 3.2."

### _Disputes Between the Parties_

### Financial Goals

45.    In September 2019, it became apparent to the Shareholder Representatives that Marchex was refusing to cooperate with the Shareholder Representatives' requests to provide information regarding the operations of the Company.

46.     The Shareholder Representatives' concern was precipitated in part by the fact that Andrew Osmak, who had been the Company's CEO and *de facto* head of sales, was on an extended medical leave, as a result of misconduct on the part of Marchex's management.

47.     The Shareholder Representatives were also gravely concerned about Defendant's management of the Company and the strategic direction of the Company, particularly given the fact that no acting CEO had been put in place by Marchex, during Osmak's absence.

48.     Marchex refused to provide Mr. Barnard and Mr. McEvenue with sufficient information about the Company in order to enable them to evaluate either the Company's performance or whether it was being operated as required by Section 1.8(a) of the SPA.

49.     Accordingly, on September 10, 2019, Mr. Barnard communicated to Defendant and specifically requested that Defendant provide the following information:

a.  Information regarding who was managing the strategic direction and the operations of the Company in Andrew Osmak's absence;

b.  Information regarding who was maintaining the Company's client relationships and working on business development and sales initiatives that Mr. Osmak had in place prior to the commencement of his medical leave;

c.  A list of the Company's management team;

d.  The Company's business plan;

e.  An update on how the Company was tracking in relation to the Financial Goals (as defined in the SPA);

f.  An overview of the strategy for maximizing the Company's revenue;

g.  An overview of any steps that had been taken or were planned with respect to integration of Marchex and the Company that may have impacted the Company's achievement of its stated revenue goals;

h.  An explanation of the circumstances surrounding the medical leave of the Company's CEO, Andrew Osmak.

50.    On September 13, 2019, Defendant, through its general counsel, Michelle Paterniti ("Paterniti"), refused to provide any of the requested information based on the false pretext that the requested information constituted non-public financial and operational information regarding the Telmetrics business and could not be disclosed pursuant to U.S. securities laws.

51.    On November 1, 2019, Defendant sent a correspondence pursuant to which Defendant would be requesting a portion of the Escrow Deposit.

52.    Although Defendant attempted to characterize the document as a "Claim Notice" under the SPA, this correspondence did not satisfy the conditions precedent to constitute a valid "Claim Notice" under the SPA.

53.    Specifically, the November 1, 2019 document, did **<u>not</u>** identify any *actual* losses that occurred. Rather, this correspondence merely stated that there were "Losses relating to the Indemnification Claims" which "**<u>may have occurred</u>**". Moreover, the November 1, 2019 document did not contain a determination of any Losses and merely referenced "estimated Losses in excess of US$760,000". The purported "indemnifiable matters" were not absolute as to liability nor were they liquidated as to amount.

54.    On November 10, 2019, Mr. Barnard sent a correspondence to Defendant, as required by the Escrow Agreement, disputing the validity of the November 1, 2019

correspondence and confirmed that the Shareholder Representatives (1) categorically denied any breach of any representation under the SPA; (2) disputed that a valid "claim notice" had been delivered (due to the fact that Defendant had only referred to losses that "may" occur in the future and had not identified any *actual* losses or provided the supporting documentation required by the SPA); (3) requested immediate release of the Escrow Deposit (less $250,000.00); and (4) reiterated the Shareholder Representatives' request for disclosure of information.

55.    Plaintiffs further notified U.S. Bank ("Escrow Agent") that they disputed the November 1, 2019 "Claim Notice" and advised the Escrow Agent that no amount of the Escrow was to be released to Defendant. The Escrow Agent responded to Mr. Barnard, advising that the funds would remain in escrow until the claim was jointly resolved by the parties.

56.    On November 13, 2019, Mr. Barnard corresponded to Paterniti asking when the Escrow Deposit would be released, as well as when Shareholder Representatives would receive a response to their request for information relating to the Financial Goals.

57.    On November 19, 2019, Mr. Barnard corresponded to Defendant's representatives, Mike Arends and Russell C. Horowitz, following up on the requests for the information required by §1.8 of the SPA and advising that the Escrow Deposit should be released immediately.

58.    On November 26, 2019, in an email, Defendant, through Paterniti, rejected Shareholder Representatives' requests for information.

## Disputes over the First Earnout Statement

59.    On January 15, 2020, Mr. Barnard corresponded to Defendant, as follows:

a.    Following up on the September 10, 2019 request for information;

b.    Requesting a full company organizational chart highlighting any and all employees, contractors, or consulting resources present in the Company during the First Earnout Period, highlighting which of those resources were specifically dedicated 100% to executing Company's operating plan at any time during the First Earnout Period per Section 1.8(a) of the SPA, versus ongoing integration efforts with other Marchex controlled entities;

c.    Reminding Defendant that Plaintiffs were still not in receipt of the funds from escrow that were due pursuant to the SPA.

60.    Subsequent to this request, Defendant sent an Earnout Statement ("First Earnout Statement") dated January 16, 2020 for the First Earnout Period. Defendant claimed that the Earnout Consideration was not payable for the First Earnout Period.

61.    On January 17, 2020, Mr. Barnard corresponded to Defendant, reiterating his previous requests for information. Mr. Barnard acknowledged that the First Earnout Statement contained confidential information which would be appropriately treated as such by the Shareholder Representatives. Mr. Barnard's correspondence further pointed out that confidentiality was not a valid reason or basis for withholding information, as the First Earnout Statement itself contained confidential information.

62.    On January 24, 2020, Paterniti, on behalf of Defendant, distributed to Plaintiffs, by email, a one-page document to serve as "additional detail" in support of the First Earnout

Statement. Paterniti took the position that the various types of information requested by Plaintiffs, relating to the operations of Telmetrics, were "inappropriate."

63.    On February 1, 2020, Shareholder Representatives, through counsel, sent written notice to Defendant to advise that Defendant was in breach of §1.8(b) of the SPA in that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with the First Earnout Statement. This correspondence further advised that the Shareholder Representatives disagreed with the First Earnout Statement and that the Shareholder Representatives did not accept the First Earnout Statement.

64.    The February 1, 2020 correspondence further reiterated Shareholder Representatives' request for information dated September 10, 2019 and January 15, 2020. As stated in the correspondence, Defendant had failed to provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2019 conclusion of the First Earnout Period. As explained in the February 1, 2020 correspondence further stated that the information had been requested by the Shareholder Representatives in order to enable them to evaluate the financial results set out in the First Earnout Statement, whether the business of the Company had been carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner, as required by §1.8(a) of the SPA.

65.    Defendant did not respond to Plaintiffs' information requests, did not work in good faith to resolve Plaintiffs' disagreements with the First Earnout Statement, and did not retain a Final Accounting Firm – as it was obligated to do under the SPA.

**Disputes over the Second Earnout Statement**

66.    In January 2021, Defendant sent an Earnout Statement for the Second Earnout Period ("Second Earnout Statement").[5] Defendant claimed that the Earnout Consideration was not payable for the Second Earnout Period.

67.    On January 18, 2021, Plaintiffs' counsel notified Defendant, through counsel, of the following:

a.    That Plaintiffs disputed the Second Earnout Statement with respect to the Second Earnout Period;

b.    That Defendant remained in breach of the SPA for failing to provide information reasonably requested by the Shareholder Representatives in connection with the First Earnout Period;

c.    That Defendant risked a second and distinct breach of the SPA with respect to information reasonably requested by Shareholder Representatives and required in order to evaluate the Second Earnout Statement. Specifically, the information requests made on September 10, 2019, January 15, 2020 and February 1, 2020 sought information required in order to evaluate the financial results set out in both the First and Second Earnout Statements and to follow up with additional specific and reasoned information requests;

d.    That the information requested by the Shareholder Representatives was required to evaluate the financial results set forth in both the First and Second Earnout Statements, which were necessarily impacted by whether the business of the

---

[5] The correspondence from Defendant was mistakenly dated January 14, 2020, despite the fact that the correspondence was actually being written in January 2021.

Company was carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner with respect to the Company's business, as required by Section 1.8(a) of the SPA;

e.  That information requests had been made September 10, 2019, January 15, 2020, and February 1, 2020 – but to no avail. Plaintiffs' counsel again reiterated these requests.

68.    Defendant did not respond to Plaintiffs' information requests, did not work in good faith to resolve Plaintiffs' disagreements with the Second Earnout Statement, and did not retain a Final Accounting Firm, as it was required to do under the SPA.

69.    Defendant did not offer at any time any response to requests for information requests beyond that which was contained in the First and Second Earnout Statements and merely responded with obfuscation and denials.

70.    While Shareholder Representatives attempted to comply with their responsibilities under the SPA, Defendant, knowingly and in bad faith, withheld information reasonably requested by Shareholder Representatives. As a result of Defendant's misconduct, the Shareholder Representatives were prevented from exercising their rights under §1.8 of the SPA.

71.    Defendant received notification by the Shareholder Representatives regarding their disagreements with respect to the First Earnout Statement and Second Earnout Statement, and Shareholder Representatives' disagreement with respect to Defendant's refusal to provide information to enable the Shareholder Representatives to exercise their rights under Section 1.8 of the SPA.

72.    Defendant did not attempt in good faith to resolve Plaintiffs' disagreement with either the First Earnout Statement or the Second Earnout Statement.

17

73.     As a result, Plaintiffs and Defendant were unable to resolve their disagreements on or before the date 15 days following notification by the Shareholder Representatives of the disagreements.

74.     Accordingly, pursuant to Section 1.8(c) of the SPA, Defendant was under a mandatory obligation to retain the "Final Accounting Firm."

75.     Despite its contractual obligation to do so, Defendant never retained the "Final Accounting Firm" to resolve the disputes over the First Earnout Statement or Second Earnout Statement.

**Dispute over Escrow Deposit**

76.     On November 1, 2019, Defendant circulated what was purported to be a  "claim" (dated November 1, 2019), vaguely referencing supposed indemnity claims under the SPA, concluding with Defendant's unsupported and speculative estimate that the total "claim" amount would be in excess of $760,000. Defendant provided no detail or support for what it characterized as its "estimated losses." Defendant failed to provide the required relevant information or a good faith estimate of the reasonably foreseeable maximum amount of the alleged claims.

77.     Significantly, the items referenced in the November 1, 2019 correspondence as "Indemnifiable Matters" were *not* absolute as to liability nor were they liquidated as to amount. On November 4, 2019, Paterniti sent an email to McEvenue and Barnard, attaching the November 1, 2019 correspondence.

78.     On November 10, 2019, Mr. Barnard, on behalf of Plaintiffs, advised Defendant that the November 1, 2019 correspondence was *not* a "Claim Notice" under the SPA, pointing out that Defendant's November 1, 2019 letter had only vaguely described uncertain, possible

losses that "may" occur in the future and that Defendant had not provided any of the requisite information to meet the conditions precedent for a valid Claim Notice under the SPA or to justify withholding any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA) be released.

79.    Plaintiffs also corresponded to the Escrow Agent, U.S. Bank ("Escrow Agent"), that no amount of the Escrow Deposit was to be released to Defendant.

80.    The Escrow Agent responded to Mr. Barnard, confirming that the funds would remain in escrow until the claim was jointly resolved by the parties.

81.    Thereafter, on February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. Bank, demanding that the Escrow Agent send the disputed $760,000.00 to *Defendant*. Defendant, however, had not fulfilled the necessary conditions precedent and therefore, was not entitled to demand this release under either the SPA or the Escrow Agreement. Moreover, Defendant's request was in breach of the Escrow Agreement, as Defendant had still never sent a valid "Claim Notice."

82.    Even *if* the claims had been validly presented (which Plaintiffs deny), and the claims had not been disputed (which Plaintiffs deny), §3.3 of the Escrow Agreement only permitted Defendant to demand that the Escrow Agent retain for future return to Defendant, as and when the amount was determined pursuant to the Escrow Agreement. That amount, however, was *never determined*.

83.    Significantly, until that point, Defendant had *never* sent the required Notice to Withhold, required by §3.7 of the Escrow Agreement. Defendant's failure to do so rendered the November 1, 2019 *void* as a claim notice, as expressly mandated by §3.7 of the Escrow Agreement, which states that in the event that Defendant "does not provide the notice required

by this Section 3.7, (a) all claim notices received by Sellers or the Escrow Agent from [Marchex, Inc.] pursuant to Section 3.2 shall be void and of no further effect and (b) all remaining funds held in the Escrow Deposit shall be distributed by the Escrow Agent to the Shareholder Representatives promptly after the Escrow Release Date in accordance with Section 3.8 notwithstanding any previously received claim notice given by [Marchex, Inc.] pursuant to Section 3.2."

84.    Based on Defendant's November 1, 2019 correspondence, however, there were no losses that were alleged to have actually occurred, as the November 1, 2019 correspondence merely contained a referenced to losses that "may have" occurred.

85.    The November 1, 2019 correspondence did *not* identify a single Indemnification Matter which was either i) absolute as to liability, or ii) liquidated as to amount. Accordingly, on or before the Escrow Release Date, Defendant was required to send a Notice to Withhold, pursuant to §3.7 of the Escrow Agreement. Defendant never sent the required Notice to Withhold with respect to the $760,000.00 subject to the November 1, 2019 correspondence.

86.    Nevertheless, despite the fact that it was not entitled to do so, Defendant deliberately delivered this February 3, 2020 request by hand to the Escrow Agent, and sent it to the Shareholder Representatives only by mail, knowing full well that there would be a considerable delay between the hand-delivered notice and the notice by mail, intentionally and effectively depriving the Shareholder Representatives of the ability to respond.

87.    As intended by Defendant, the Shareholder Representatives did not receive the February 3, 2020 demand by Defendant until *February 13, 2020*. The Escrow Agreement provided that all notices and communications under the Escrow Agreement were deemed given

*when* received. *See* Escrow Agreement, §6.3. Thus, Defendant's February 3, 2020 correspondence was not "given" to the Shareholder Representatives until February 13, 2020.

88.     The Shareholder Representatives received Defendant's correspondence demanding release of the $760,000.00 from the Escrow Deposit on February 13, 2020, *ten days* after the $760,000.00 had already been improperly released to Defendant by U.S. Bank. Although Defendant's scheme worked, the conduct was wrongful, willful and in breach of both the SPA and the Escrow Agreement.

89.     On February 14, 2020, one day after receipt, Plaintiffs' counsel again notified both the Escrow Agent and Defendant that the original November 1, 2019 letter was *not* a valid "Claim Notice" and that Plaintiffs did *not* agree to the release of the Escrow Deposit.

90.     Plaintiffs' counsel's correspondence noted, among other things, that Defendant had delivered an invalid Claim notice, that Plaintiffs had communicated their position that the Claim notice was invalid to Defendant on November 10, 2019, and that the Escrow Deposit should have been released to the *Shareholder Representatives*.

91.     Defendant's demand for a release of the Escrow Deposit in the face of a dispute with respect to the validity of the Claim notice was improper and further evidenced Defendant's bad faith activity in connection with the SPA and the Escrow Agreement.

92.     Plaintiffs' counsel's February 14, 2020 correspondence further pointed out that the Escrow Agent was required to have a written agreement signed by both Plaintiffs and Defendant for any release of the Escrow Deposit, or a final decision with respect to the alleged Indemnifiable Matters in order to release the Escrow Deposit.

93.     Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

94.     On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had already sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

95.     On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

96.     On May 1, 2020, Defendant's counsel sent to the Shareholder Representatives an "Updated Claim Notice" – demanding that the Escrow Agent retain the remaining $250,000.00 of the Escrow Deposit.

97.     In the May 1, 2020 correspondence, Defendant requested, pursuant to §3.7 of the SPA, that the Escrow Agent withhold $250,000.00 remaining in the custody of the Escrow Agent – without making any reference to any of the claims or amounts set forth in the November 1, 2019 correspondence.

98.     On May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, disputing the May 1, 2020 "Updated Claim Notice", demanding immediate release of the remaining $250,000.00 of the Escrow Deposit and reserving the previous dispute regarding the improper release of the $760,000.00 to Defendant.

99.     On May 5, 2020, Plaintiffs' counsel sent an additional letter to Defendant, disputing the May 1, 2020 "Updated Claim Notice" and noting that the "Updated Claim Notice" - like the November 1, 2019 letter - was not a valid claim notice due to the fact that it merely vaguely referenced possible losses that "may occur" and did not refer to any "losses" within the meaning of the SPA. This correspondence also pointed out that Defendant had failed to provide the required relevant information or a good faith estimate of the reasonably foreseeable maximum amount of the alleged claims.

22

100.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent.

101.    In the absence of agreement and joint instruction by the parties, in order to be entitled to any amount of the Escrow Deposit, Defendant was required to obtain a final determination of its rights with respect to the Escrow Deposit, as set forth in the Escrow Agreement. Defendant has not done so.

102.    Defendant's conduct with respect to the Escrow Deposit constitutes a breach of Defendant's obligations under the SPA and the Escrow Agreement.

103.    Defendant not only wrongfully caused the Escrow Agent to release $760,000.00 to *Defendant*, but Defendant also wrongfully caused the Escrow Agent to withhold the remaining $250,000.00, in breach of Section 1.5 of the SPA and in breach of the Escrow Agreement.

104.    Defendant's breaches of the SPA and the Escrow Agreement have damaged Plaintiffs, who are entitled to be paid the entire Escrow Deposit.

105.    Defendant's scheme to obtain the Escrow Deposit, without notice to the Shareholder Representatives and without establishing entitlement to such funds was underhanded, egregious, reckless, reprehensible, malicious, and in bad faith.

### *Plaintiffs' Request for Punitive Damages*

106.    Plaintiffs pleads the following facts in support of their claims for punitive damages.

107.    Punitive damages seek to punish the defendant for behavior and conduct that is considered egregious, reckless, reprehensible, or filled with malice.

108.    Under Delaware law, punitive damages are recoverable where the defendant's conduct exhibits a wanton or willful disregard for the rights of the plaintiff.

109.    For a defendant's conduct to be found willful or wanton, the conduct must reflect a conscious indifference or "I don't care" attitude.

110.    Defendant's conduct with respect to the SPA and the Escrow Agreement was knowing, intentionally and performed with the *specific* intent to deprive Plaintiffs of the benefits of the SPA – and demonstrating no regard whatsoever for the consequences of its misconduct or the process set forth in the SPA and the Escrow Agreement.

111.    When analyzing a punitive damages award, Delaware courts consider whether:

    a.    the harm caused was physical as opposed to economic;

    b.    the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

    c.    the target of the conduct had financial vulnerability;

    d.    the conduct involved repeated actions or was an isolated incident; and,

    e.    the harm was the result of intentional malice, trickery, or deceit, or mere accident.

112.    Defendant, a publicly traded corporation, knew that Plaintiffs did not have the financial means that Defendant had, and purposely capitalized on that, engaging in malicious, intentional, fraudulent, unreasonable, willful and wanton and conduct  - with a complete disregard for the rights of Plaintiffs – and at all times designed to prevent *any* funds from being paid to Plaintiffs and to cause Plaintiffs to spend as much of their own money as possible.

113.    Defendant has consistently conducted themselves in bad faith since the closing of the SPA, as detailed herein, with the intent to deprive Plaintiffs of the benefits of the SPA.

114.    During the course of the transactions, Defendant consistently and openly flouted its obligations under the SPA, generally completely ignoring Plaintiffs' attempts to communicate with them and request information. Defendant's cursory attempts to fulfill, in form only, the

requirements of the SPA and the Escrow Agreement lacked any indicia of good faith and failed to meet the minimum standards required under the SPA and the Escrow Agreement. Defendant provided little to no information, and then exacerbated the situation by openly stonewalling and responding to any requests made by Plaintiffs or their attorneys with pretextual excuses.

115.    Defendant, through its representatives, has sent correspondences in order to create the appearance of compliance with the SPA which, in reality, contained no actual information and certainly not the information required by the SPA and/or the Escrow Agreement.

116.    Defendant, through its representatives, has, at each step, undermined the spirit and letter of both the SPA and the Escrow Agreement, in order to reap as much money and profit – without regard to any actual entitlement – under the SPA.

117.    Defendant concocted and executed an unjustified scheme to obtain control over and possession over the funds from the Escrow Deposit, which rightfully belonged to Plaintiffs and should have been paid entirely to Plaintiffs – subject to *limited* circumstances. In doing so, Defendant exerted pressure over the Escrow Agent, despite clearly not having complied with either the express terms or spirit of the Escrow Agreement and SPA.

118.    The timing and chronology of Defendant's conduct demonstrated intentional and knowing delay, perpetrated with the specific intent to prejudice Plaintiffs and inhibit and/or prevent them from adequately protecting their own interests with respect to either the Earnout Consideration, or the amounts due from the Escrow Deposit.

119.    Moreover, Defendant intended to, and in fact, did willfully mislead and coerce the Escrow Agent by making material misrepresentations and/or omitting material facts, in demanding that the Escrow Agent transfer funds to Defendant from the Escrow Deposit.

120.    Defendant's misconduct was intended to mislead the Escrow Agent into believing that Defendant had "ownership" over funds held in escrow when, in fact, those funds did *not* belong to Defendant, actually, belonged to Plaintiffs and were merely held in escrow to provide security for very specific and limited indemnity claims (none of which have ever been established by Defendant).

121.    Defendant's outrageous conduct has left Plaintiffs in the position of having to bring this action in order to simply obtain the relief afforded to them under the SPA.

122.    At no point did Defendant conduct itself with *any* measure of good faith.

123.    Based on the foregoing, Plaintiffs will request an award of punitive damages.

124.    In determining any award of punitive damages, a finder of fact may consider the nature of Defendant's conduct and the degree to which the conduct was reprehensible.

125.    A finder of fact may assess an amount of damages that will deter Defendant and others like Defendant from similar conduct in the future.

126.    A finder of fact may consider Defendant's financial condition when evaluating deterrence.

127.    Based on the foregoing, in light of the compensatory damages suffered by Plaintiffs as requested herein, and in light of Defendant's financial condition, Plaintiffs are entitled to an award of punitive damages, in excess of $20,000,000.00.

## COUNT I

## BREACH OF CONTRACT

## (ACCELERATION EVENTS)

128.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein at length.

129.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

130.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

131.    Pursuant to Section 1.8(e) of the SPA, upon the occurrence of an Acceleration Event (defined in the SPA), Defendant was obligated to make certain payments to Plaintiffs. Section 1.8(e) of the SPA provides the following:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then, following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the applicable Earnout Period.

132.    On page 53 of the SPA, an "Acceleration Event" was defined, as set forth below:

> "*Acceleration Event*" means any of the following: (a) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in connection with the first Earnout Period has been earned as a result of achieving the applicable Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not resigned without Good Reason or been terminated for Cause and the Parent reduces the Company's workforce to less than 35 employees without consent of the Shareholder Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or (e) the Company becomes subject to wind-up, liquidation or dissolution.

## *Acceleration Event – Reduction of Work Force*

133.    During either the First Earnout Period or Second Earnout Period, Defendant reduced the Company's workforce to less than 35 **employees** without the consent of the Shareholder Representatives. Defendant made this reduction without Osmak having been terminated for Cause or having resigned without Good Reason.

134.    At such time as Defendant reduced the Company's workforce to less than 35 employees, Osmak had not resigned without Good Reason and had not been terminated for cause.

135.    Accordingly, Defendant's reduction of the Company's workforce to less than 35 employees without the consent of the Shareholder Representatives constituted an Acceleration Event under the SPA.

136.    Payment pursuant to Section 1.8(e) was either due within 90 days of November 5, 2019 (or February 3, 2020) or within 90 days of November 5, 2020 (or February 3, 2021), depending on *when* Defendant reduced the Company's workforce to less than 35 employees without consent of the Shareholder Representatives.

137.    Pursuant to the SPA, if the Company's workforce was reduced to less than 35 employee during the First Earnout Period, Defendant was obligated to pay $3,000,000.00 to Plaintiffs. *See* SPA, §1.8(e).

138.    Pursuant to the SPA, if the Company's workforce was reduced to less than 35 employees during the Second Earnout Period, Defendant was obligated to pay $1,750,000.00 to Plaintiffs. *See* SPA, §1.8(e).

139.    Defendant breached Section 1.8(e) of the SPA by failing to make the payment as required due to the occurrence of this Acceleration Event during either the First or Second Earnout Period, causing Plaintiffs to suffer money damages, in an amount equal to the amounts to be determined in accordance with §1.8(e) of the SPA, in an amount equal or greater to $1,750,000.00.

140.    However, despite repeated requests by Plaintiffs, Defendant has refused to provide information to Plaintiffs in order to enable Plaintiffs to determine whether the Company's workforce was reduced to less than 35 employees either during the First Earnout Period or Second Earnout Period, and to determine whether Plaintiffs were entitled to be paid either $3,000,000.00 or $1,750,000.00.

141.    Despite the fact that Defendant could have easily, through any number of ways, demonstrated that the Company's workforce was never reduced to less than 35 employees, Defendant has failed to do so. Defendant has resorted to obfuscation, dishonesty and potentially fraudulent misrepresentations to Plaintiffs in its attempts to deter Plaintiffs from pursuing the payment under the SPA due to the occurrence of this Acceleration Event.

142.    Given the ease with which this information could be provided and confirmed if available, Defendant's consistent refusal to do so, except for the failed attempt to provide

fraudulent information, is a clear indication that no such information exists, leading to the inescapable conclusion that there were fewer than 35 employees during either the First Earnout Period or Second Earnout Period, and that Plaintiffs are entitled to a payment pursuant to the SPA.

143.    Defendant's failure to pay pursuant to §1.8(e) does *not* constitute a disagreement with respect to an Earnout Statement and thus, is *not* subject to resolution by a Final Accounting Firm pursuant to Section 1.8 (c) of the SPA.

### *Acceleration Event – Termination of Osmak without Cause*

144.    On March 3, 2020, Osmak's employment with the Company ended as a result of the constructive termination of Osmak's employment by Defendant.

145.    Defendant's termination of Osmak's employment was without Cause.[6]

146.    Defendant's termination of Osmak's employment occurred after the completion of the First Earnout Period but prior to the end of the Second Earnout period.

147.    Accordingly, Defendant's termination of Osmak's employment constituted an Acceleration Event under the SPA.

148.    As a result, payment by Defendant to Plaintiffs pursuant to Section 1.8(c) was due within 90 days of November 5, 2020 (or February 3, 2021).

149.    Defendant breached Section 1.8(e) of the SPA by failing to make the payment as required due to the occurrence of this Acceleration Event during the Second Earnout Period, causing Plaintiffs to suffer money damages, in an amount equal to the amounts to be determined in accordance with §1.8(e) of the SPA, in an amount equal or greater to $1,750,000.00.

---

[6] "Cause" is a defined term in the SPA.

150.    Defendant's failure to pay pursuant to §1.8(e) does *not* constitute a disagreement with respect to an Earnout Statement and thus, is *not* subject to resolution by a Final Accounting Firm pursuant to Section 1.8 (c) of the SPA.

151.    Defendant's misconduct, as detailed in this Amended Complaint, was fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows for actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's failure to make payment in accordance with the terms of the SPA as a result of the occurrence of the aforementioned Acceleration Events, in an amount to be determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT II

## BREACH OF CONTRACT

## (SPA AND ESCROW AGREEMENT)

152.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein at length.

153.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

154.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

155.    The Escrow Agreement is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

156.    Plaintiffs performed all of their obligations and all conditions precedent under the Escrow Agreement.

157.    As detailed above, pursuant to the SPA and the Escrow Agreement (which was attached as Exhibit C to the SPA), an aggregate of $1,010,000.00 was held in escrow by the Escrow Agent, to be released to Shareholders on the "Escrow Release Date" – or eighteen months after the November 5, 2018 Closing Date.

158.    Pursuant to the SPA and Article III of the Escrow Agreement, Defendant was permitted to offset the amount of any *actual* indemnification claims against the escrow funds. In the absence of any *actual* indemnification claims, however, in the first 12 months following the Closing, the Escrow Deposit was to be reduced to $250,000.00 – and the Shareholders were to receive the $760,000.00.

159.    Section 10.2(a) of the SPA required that, in the event of the occurrence of an event pursuant to which Defendant would seek indemnity pursuant to Section 10.1, Defendant was required to 1) provide Plaintiffs with *prompt* written notice (a "Claim Notice") of such event and 2) to otherwise promptly make available to Plaintiff, all relevant information which is material to the claim and which is in the possession of Defendant.

160.    Section 3.2 of the Escrow Agreement also required Defendant to *promptly* notify Plaintiffs and the Escrow Agent of an event which Defendant asserts constitutes an "Indemnifiable Matter" and to set forth the basis of such a claim, while making available to the

Shareholder Representatives *all relevant information* regarding such "Indemnifiable Matter" which was in the possession of Defendant.

161.    On November 1, 2019, just days before the 12 month anniversary of the Closing Date, when the Escrow Deposit was scheduled to be reduced to $250,000.00, per §3.1 of the Escrow Agreement, Defendant sent a correspondence, listing a number of incomprehensible and intentionally vague claim descriptions, without any identified losses and without indicating exactly *when* any of the claims purportedly occurred.

162.    The entirety of the information provided by Defendant was contained in four bullet points, as demonstrated in the following "Annex I" of the November 1, 2019 correspondence:

---

**ANNEX I**

**Indemnification Claims**

- Hibu, Inc. credit calculation error and additional credit obligation for 2017/2018.

- Infutor liability for contract non-compliance (cacheing of call data).

- Unblocked spam/spoofing call traffic in 2018 that was included in billings and collections to customers.

- Projected financial results and whether reasonable good faith estimates (for example: projected revenue for 2019 of up to US $12.4 million).

Our assessment of the above claims results in estimated Losses in excess of US $760,000.

---

163.    The November 1, 2019 correspondence failed to meet the condition precedent of the SPA and the Escrow Agreement, did not constitute a valid "Claim Notice" and thus, Defendant's subsequent conduct to wrongfully effectuate the transfer of the $760,000.00 was in breach of both the SPA and the Escrow Agreement.

164.    First, the November 1, 2019 correspondence *was not sent promptly* after the alleged occurrence of any of the alleged events, as required pursuant to §10.2 of the SPA and §3.2 of the Escrow Agreement. On the contrary, the November 1, 2019 correspondence was sent at the last possible minute, on November 1, 2019, just days before the 12 month anniversary of the November 5, 2018 Closing Date, when the Escrow Deposit was scheduled to have been reduced to $250,000.00.[7]

165.    Second, Defendant's November 1, 2019 correspondence did *not* satisfy the condition precedent of identifying an event constituting an Indemnifiable Matter from which Losses *had* occurred, as required by the SPA, and pursuant to §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was substantially ambiguous, uncertain and equivocal, stating merely that "Losses" relating to "Indemnification Claims" "*may have occurred.*"

166.    Third, Defendant's November 1, 2019 correspondence did *not* set forth Defendant's good faith estimate of the reasonably foreseeable maximum amount of its claim for indemnification as required by the SPA and by §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was patently vague and ambiguous, merely stating that there were "estimated Losses in excess of US $760,000.00." Defendant did not even address, let alone fulfill, the requirement to provide a good faith estimate of the reasonably foreseeable maximum amount of its claim.

---

[7] In connection with only with "Third Party Claims", as defined in the SPA, §10.2 of the SPA provides that Parent's failure to give a timely Claim notice or to promptly furnish the Shareholder Representative, with any relevant data and documents shall not constitute a defense (in part or in whole) to any claim for indemnification by such party, except and only to the extent that such failure shall result in any prejudice to the indemnified party. Defendant's failure to identify any Third Party Claims renders this provision inapplicable and irrelevant to any excuse Defendant may try to assert for its failure to abide by its prompt notification obligations.

167.    Fourth, Defendant's November 1, 2019 correspondence did *not* make available to the Shareholder Representatives all relevant information regarding any Indemnifiable Matter which was in the possession of Defendant, as required by the SPA and §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence merely listed various contractual clauses – followed by four superficial bullet points – which failed to even so much as set forth the date, the nature, the substantive basis or the parties involved, clearly failing to provide "all relevant information."

168.    Defendant consistently refused, and continued to refuse, to provide any material information to support the "claims" – which were nothing more than general business losses, and did not meet the definition of an "Indemnifiable Matter" under the SPA.

169.    Due to Defendant's delay in notifying Plaintiffs of their purported claims, and refusal to provide any of the required information, Plaintiffs were materially prejudiced in their ability to respond – which the notification requirements of the SPA and the Escrow Agreement was specifically intended to prevent.

170.    For these reasons, on November 10, 2019, Mr. Barnard, Plaintiffs notified Defendant that the November 1, 2019 correspondence was not a valid Claim Notice. As Mr. Barnard advised, Defendant's November 1, 2019 letter merely contained vague references to possible losses that "may" occur in the future, and contained none of the requisite information to give rise to any contractual right to withhold any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA) be released.

171.    Plaintiffs further notified U.S. Bank ("Escrow Agent") that they disputed the November 1, 2019 "Claim Notice" and advised the Escrow Agent that no amount of the Escrow

was to be released to Defendant. The Escrow Agent responded to Mr. Barnard, advising that the funds would remain in escrow until the claim was jointly resolved by the parties.

172.    Thereafter, on February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. Bank, demanding that the Escrow Agent send the disputed $760,000.00 to *Defendant*. However, as described above, Defendant deliberately delivered this request by hand to the Escrow Agent, and mailed it to the Shareholder Representatives, knowing full well that there would be a considerable delay between the hand-delivered notice and the notice by mail such that the Shareholder Representatives would not have the ability to respond.

173.    On February 14, 2020, Plaintiffs' counsel notified both the Escrow Agent and Defendant that the November 1, 2019 correspondence was not a valid Claim Notice and that Plaintiffs did not agree to the release of the Escrow Deposit. Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

174.    On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

175.    On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

176.    Specifically, Section 3.3 of the Escrow Agreement does not provide for the release of any amount to Defendant in an absence of a determination with respect to an indemnification claim by Defendant.

> 3.3    Claims Not Disputed by Company and/or the Shareholder Representatives. If, within thirty (30) days after the Escrow Agent's receipt of the notice described in Section 3.2 hereof, the Shareholder Representatives have not given the Escrow Agent the notice provided for in Section 3.4 hereof, the Parent shall be entitled to make demand upon the Escrow Agent that it retain for future return to the Parent as and when the amount is determined pursuant to the provisions hereof, if it is not then determined, or that it then disburse to the Parent, if it has then been determined, an amount of the Escrow Deposit having a value equal to the lesser of (i) the full amount set forth in the notice described in Section 3.2 or (ii) the entire Escrow Deposit. The Escrow Agent may conclusively rely on any such Parent demand.

*See* Escrow Agreement, Section 3.3.

177.    To this date, no such claim has been validly made, no document-supported claim has been advanced by Defendant and certainly no determination has been made.

178.    Moreover, the items referenced in Defendant's November 1, 2019 correspondence were *not* absolute as to liability and *not* liquidated as to amount.

179.    Thus, pursuant to §3.7, Defendant was required to send a "Notice to Withhold" to the Escrow Agent and the Shareholder Representatives to notify the Escrow Agent and the Shareholder Representatives of the amount, if any, to be retained after the Escrow Release Date on account of Indemnifiable Matters referenced in the November 1, 2019 correspondence.

180.    Defendant failed to send the required Notice to Withhold with respect to the matters set forth in the November 1, 2019 correspondence, in breach of its obligations pursuant to §3.7 of the Escrow Agreement.

181.    In fact, rather than comply with §3.7 of the Escrow Agreement, Defendant willfully ignored, disregarded and breached the terms of the Escrow Agreement, which provided a mechanism for Defendant to request that the Escrow Agent at *best* withhold the amount set forth in the notice, regarding its claims, which were *not* absolute as to liability and *not* liquidated as to amount.

182.    Instead, Defendant intentionally, knowingly and willfully skipped over this step entirely, wrongfully requesting, causing and pressuring the Escrow Agent to release $760,000.00 to *Defendant*, in breach of the SPA and the Escrow Agreement and causing Plaintiffs to suffer damages by depriving Plaintiffs of the $760,000.00, which belonged to Plaintiffs.

183.    As a direct and proximate result of Defendant's failure to provide the notice required by §3.7 of the Escrow Agreement, Defendant's November 1, 2019 correspondence was *not* a claim notice, was rendered void and was of no further effect, pursuant to §3.7 of the Escrow Agreement. Defendant was required to, but never did, send a Notice to Withhold, to request that the Escrow Agent withhold any of the amounts referenced in the November 1, 2019 correspondence.

184.    As a result of Defendant's failure to perform the conditions precedent to maintain the Escrow Agent's ability to withhold the $760,000.00, those funds held in the Escrow Deposit should have been distributed by the Escrow Agent to the Shareholder Representatives promptly after the Escrow Release Date.

185.    On May 1, 2020, Defendant's counsel sent to the Shareholder Representatives an "Updated Claim Notice" – demanding that the Escrow Agent retain the remaining $250,000.00 of the Escrow Deposit.

186.    In the May 1, 2020 correspondence, Defendant made a limited request, pursuant to §3.7 of the SPA, that the Escrow Agent withhold $250,000.00 remaining in the custody of the Escrow Agent with respect to the matters in the May 1, 2020 correspondence – without making any reference to any of the claims or amounts set forth in the November 1, 2019 correspondence.

38

187.    On May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the remaining $250,000.00 in escrow was to be released to Plaintiffs, in addition to the $760,000.00, which should have been released to Plaintiffs on November 5, 2019.

188.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent, which Plaintiffs contend should be released to Plaintiffs.

189.    Just like the November 1, 2019 correspondence, the May 1, 2020 "Updated Claim notice, was deficient as follows:

    a.    It *was not sent promptly* after the alleged occurrence of any of the alleged events, as required pursuant to §10.2 of the SPA and §3.2 of the Escrow Agreement, and was sent at the last possible minute, on May 1, 2020, just days before the May 5, 2020 Escrow Release Date;

    b.    It did *not* satisfy the condition precedent of identifying an event constituting an Indemnifiable Matter from which Losses *had* occurred, as required by the SPA, and pursuant to §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was substantially ambiguous, uncertain and equivocal, stating merely that "Losses" relating to "Indemnification Claims" "*may have occurred.*"

    c.    It did *not* set forth Defendant's good faith estimate of the reasonably foreseeable maximum amount of its claim for indemnification as required by the SPA and by §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was patently vague and ambiguous, merely stating that there were "estimated Losses in excess of US $1,010,000.00" and "up to and potentially in excess of the full Purchase Price."

d. It did *not* make available to the Shareholder Representatives all relevant information regarding any Indemnifiable Matter which was in the possession of the Defendant, as required by the SPA and §3.2 of the Escrow Agreement. Rather, the May 1, 2020 Updated Claim notice merely listed various contractual clauses – followed by four superficial bullet points – which failed to even so much as set forth the date, the nature, the substantive basis or the parties involved, clearly failing to provide "all relevant information."

190.    Defendant consistently refused, and continued to refuse, to provide any material information to support the "claims" – which were nothing more than general business losses, and did not meet the definition of an "Indemnifiable Matter" under the SPA.

191.    There exists a real, live, immediate and justiciable case or controversy between Plaintiffs and Defendant regarding the entitlement of the remaining $250,000.00 of Escrow Deposit being held by the Escrow Agent.

192.    The parties are in need of a declaratory judgment declaring their rights and obligations to the Escrow Deposit under the SPA and the Escrow Agreement.

193.    In addition to money damages for the portion of the Escrow Deposit wrongfully taken by Defendant, Plaintiffs seeks a judicial declaration with respect to their entitlement to the remaining $250,000.00 of Escrow Deposit being held by the Escrow Agent under the SPA and the Escrow Agreement.

194.    Defendant's misconduct, as detailed in this Amended Complaint, was fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows:

a.  A judicial declaration that the November 1, 2019 correspondence was *not* a valid Claim notice;

b.  A judgment awarding actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's wrongful conduct with respect to the Escrow Deposit, in an amount to be determined at trial and in excess of $760.000.00;

c.  A judicial declaration that:

   i.  The May 1, 2020 correspondence was *not* a valid Claim notice;

   ii.  That Plaintiffs are entitled to an immediate release of the $250,000.00 currently held by the Escrow Agent, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

d.  Costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT III

## BREACH OF CONTRACT

## (OPERATION OF COMPANY'S BUSINESS)

195.  Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

196.  The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

197.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

198.    Pursuant to Section 1.8(a), of the SPA, Defendant was obligated to act in a good faith and in a commercially reasonable manner with respect to the operation of the Company's business. Specifically, Section 1.8(a) provided as follows:

> 1.8    Earnout.
>
>    (a)    Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

199.    Defendant breaches of Section 1.8(a) of the SPA include, but are not limited to, the following:

a.  Defendant failed to act in a commercially reasonable manner with respect to the operation of the Company's business.

b.  Defendant, through its employees and agents, operated the Company's business in bad faith with the principal purpose of avoiding the payment of the Earnout Consideration due to the Shareholders under the SPA and to have a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

c.  Defendant failed to manage the Company in a manner that was focused on achieving the Company's business plan;

42

d.  Defendant failed to put into place a CEO during the temporary departure of Andrew Osmak, leaving the Company without a CEO to guide the Company's operations, instruct employees, and communicate with customers;

e.  Defendant failed to put into place a CEO after the departure of Andrew Osmak (due to his constructive termination), leaving the Company without a CEO to guide the Company's operations, instruct employees, and communicate with customers;

f.  In Osmak's absence, Defendant failed to hire additional sales/business development resources in the absence of Mr. Osmak, who was, until the time of his leave and subsequent termination, was the primary business development resource and served as the *de facto* head of sales for the Company;

g.  Defendant failed to deploy adequate staffing (employees, contractors, or consulting resources) to executing the Company's operating plan;

h.  Rather than deploy resources to the Company, Defendant not only diverted the Company's limited resources to efforts related to the integration of other Marchex controlled entities, to the detriment of the Company, but Defendant also communicated those integration efforts to its public shareholders.

200.  Due to Defendant's deliberate refusal to provide documentation and information to Plaintiffs, Plaintiffs' knowledge regarding the specifics of Defendant's breaches is limited and Plaintiffs have been materially prejudiced in their ability to pursue their claims under the SPA.

201.    As a direct and proximate result of Defendant's breaches of Section 1.8(a) of the SPA, Plaintiffs were damaged in that they did not receive payment of the Earnout Consideration which they would have been paid under the terms of the SPA.

202.    Had Defendant performed its obligations to operate the Company as required by §1.8(a) of the SPA, the Company would have performed in such a manner that would have resulted in Plaintiffs being paid $3,000,000,00, the full amount of the Earnout Consideration, pursuant to §1.2(b) of the SPA.

203.    Defendant's misconduct, as detailed in this Amended Complaint, was fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendant, for actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's breaches of Section 1.8(a) of the SPA, in an amount to be determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT IV

## BREACH OF CONTRACT

## (FAILURE TO PAY EARNOUT CONSIDERATION)

204.    Plaintiffs incorporate by reference the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

205.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

206.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

207.    Pursuant to Section 1.8(b), of the SPA, no later than 75 days following the conclusion of each Earnout Period, Defendant was obligated to prepare and deliver the following to Plaintiffs:

    a.   An "Earnout Statement" (defined as a "statement calculating whether Financial Goals have been achieved");

    b.   such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.

208.    Specifically, Section 1.8(b) provided as follows:

> (b)    The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.  For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

209.    In the event of a disagreement with an Earnout Statement by Plaintiffs, Marchex was obligated to give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants. *See* SPA, §1.8(c).

210.    Further, Marchex and the Shareholder Representatives agreed to attempt to resolve those disagreements in good faith. *See* SPA, §1.8(c).

211.    Section 1.8(c) provided as follows:

> (c)    If the Shareholder Representatives disagree with an Earnout Statement, the Shareholder Representatives shall notify the Parent on or before the date fifteen (15) days after the date on which the Parent delivers to the Shareholder Representatives such Earnout Statement, failing which such Earnout Statement shall be deemed to be accepted by the Sellers with respect to the corresponding Earnout Period.  The Parent and the Buyer shall give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under this Section 1.8.  The Parent and the Shareholder Representatives shall attempt to resolve any such disagreements in good faith.  If the
>
> 5
>
> CAN: 28618682.8
>
> Parent and the Shareholder Representatives are unable to resolve all such disagreements on or before the date fifteen (15) days following notification by the Shareholder Representatives of any such disagreements, the Parent shall retain the Final Accounting Firm to resolve all such disagreements, who shall adjudicate only those items still in dispute with respect to the Earnout Statement.

212.    If a dispute over an Earnout Statement could not be resolved on or before the date 15 days following notification by the Shareholder Representatives of any such disagreements, **Defendant** was obligated to retain an accounting firm ("Final Accounting Firm") for the sole purpose of resolving disagreements over the Earnout Statement. *See* SPA, §1.8(c).

213.    Per Section 1.8(c) of the SPA, the Final Accounting Firm was empowered to *"only adjudicate those items still in dispute with respect to the Earnout Statement.*"

### *First Earnout Statement – Dispute*

214.    On January 16, 2020, Defendant sent the First Earnout Statement. Defendant claimed that the Earnout Consideration was not payable for the First Earnout Period.

215.    Shareholder Representatives, through counsel, sent timely notice, in compliance with the SPA, to Defendant of the Shareholder Representatives' disagreement with the First Earnout Statement and notifying Defendant that the Shareholder Representatives did not accept the First Earnout Statement.

216.    Shareholder Representatives further advised Defendant that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with

the First Earnout Statement. The correspondence further reiterated Shareholder Representatives'
request for information, stating that Defendant had failed to provide the information reasonably
requested within the required timeframe of seventy-five (75) days following the November 5,
2019 conclusion of the First Earnout Period.

217.    To this date, the parties have been unable to resolve Plaintiffs' disagreements with
the First Earnout Statement.

218.    With respect to the First Earnout Statement, Defendant breached its obligations
pursuant to §§1.8(b) and (c) of the SPA as follows:

    i.   Defendant did not provide supporting accounts, reports, ledgers and
information as the Shareholder Representatives reasonably requested,
pursuant to §1.8(b) of the SPA;

    ii.  Defendant did not attempt to work in good faith to resolve the
disagreements with Plaintiffs regarding the First Earnout Statement;

    iii. Defendant did not retain a Final Accounting Firm to resolve the items in
dispute with respect to the First Earnout Statement, as Defendant was
obligated to do pursuant to §1.8(c) of the SPA, due to the fact that
Plaintiffs and Defendant were unable to resolve all of their disagreements
regarding the First Earnout Statement on or before the date 15 days
following notification by Plaintiffs of the disagreement.

### *Second Earnout Statement – Dispute*

219.    On January 14, 2021, Defendant sent the Second Earnout Statement. Defendant claimed that the Earnout Consideration was not payable for the Second Earnout Period.

220.    On January 18, 2021, Shareholder Representatives, through counsel, sent timely notice, in compliance with the SPA, to Defendant of the Shareholder Representatives' disagreement with the Second Earnout Statement and notifying Defendant that the Shareholder Representatives did not accept the Second Earnout Statement.

221.    Shareholder Representatives further advised Defendant that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with the Second Earnout Statement. The correspondence further reiterated Shareholder Representatives' request for information, stating that Defendant risked a second breach of the SPA if it did not provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2020 conclusion of the First Earnout Period.

222.    To this date, the parties have been unable to resolve Plaintiffs' disagreements with the Second Earnout Statement.

223.    With respect to the Second Earnout Statement, Defendant breached its obligations pursuant to §§1.8(b) and (c) of the SPA as follows:

        i.    Defendant did not provide supporting accounts, reports, ledgers and information as the Shareholder Representatives reasonably requested, pursuant to §1.8(b) of the SPA;

        ii.    Defendant did not attempt to work in good faith to resolve the disagreements with Plaintiffs regarding the Second Earnout Statement;

iii.  Defendant did not retain a Final Accounting Firm to resolve the items in
dispute with respect to the Second Earnout Statement, as Defendant was
obligated to do pursuant to §1.8(c) of the SPA, due to the fact that
Plaintiffs and Defendant were unable to resolve all of their disagreements
regarding the Second Earnout Statement on or before the date 15 days
following notification by Plaintiffs of the disagreement.

224.    Defendant deliberately, knowingly, voluntarily and intentionally breached all of
the foregoing obligations.

225.    By failing to retain a Final Accounting Firm to resolve the aforementioned
disputes. In doing so, Defendant left Plaintiffs with no choice but to seek relief in this Court.

226.    By deliberately, knowingly, voluntarily and intentionally failing to retain a Final
Accounting Firm to resolve the aforementioned disputes, Defendant released and/or waived its
right to enforce or seek resolution of any applicable disputes by a Final Accounting Firm.

227.    As a direct and proximate result of Defendant's breaches of §§1.8(b) and (c) of
the SPA, Plaintiffs were unable to exercise their rights under the SPA, and suffered damages in
that they did not receive payment of the Earnout Consideration, or up to $3,000,000.00, which
they would have been paid under the terms of the SPA.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as
follows awarding actual, compensatory, indirect, consequential, punitive and other damages, for
the amount of Earnout Consideration to which Plaintiffs are entitled to be paid, in an amount to be
determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and
post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT V

## ABUSE OF PROCESS

228.    Plaintiffs hereby adopt and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

229.    Plaintiffs assert this Counterclaim for abuse of process against Defendant for the extraordinary costs they have incurred as a result of the Defendant's improper use of the legal process for the improper purpose of trying to obtain tactical advantage.

230.    On December 22, 2021, Marchex filed a lawsuit, captioned as *Telmetrics Corp. and Marchex, Inc. v. Andrew Osmak, Christopher Barnard, Sinc McEvenue and Richard Zurawski* in the Superior Court of Justice, Ontario, Canada (Court File No. CV-21-00674206-0000) ("Canadian Lawsuit").

231.    In the Canadian Lawsuit, Marchex asserts claims against Andrew Osmak, Christopher Barnard and Sinc McEvenue, all of whom are Shareholder Representatives under the SPA, for claims that arise under and are in connection with the SPA. Marchex's claims include conspiracy, fraud, breach of contract, and knowing assistance in breach of fiduciary duty and directly pertain to the Marchex's claims regarding Telmetrics' financial projections in connection with the SPA.

232.    Despite the clear mandate in Article 11.10 of the SPA that *any legal or equitable action or* proceeding arising under or in connection with this Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware, Marchex brought the Canadian Lawsuit in the Courts of Canada, an incorrect venue.

233.    Marchex brought their claims in Canada for ulterior purposes.

234.     First, Marchex filed the Canadian Lawsuit to harass Plaintiffs herein and deter them from pursuing their claims under the SPA in Delaware, the contractually mandated venue.

235.     Second, Marchex brought the Canadian Lawsuit in an attempt to intimidate and attempt to obtain tactical leverage over Mr. Osmak, in a previously filed employment related lawsuit between Mr. Osmak and Marchex in the Ontario Superior Court of Justice, Court File No. CV-20-00640994-0000. ("Osmak Lawsuit"). Defendant filed counterclaims in the Osmak Lawsuit, also pertaining to disputes over earn out payments under the SPA, which unquestionably arise under and are in connection with the SPA and should have been filed in Delaware.

236.     Between their affirmative claims in the Canadian Lawsuit and their counterclaims in the Osmak Lawsuit, Marchex makes unsubstantiated claims to have suffered losses in excess of $55 million dollars. Marchex has also claimed $1,000,000.00 in punitive damages in the Canadian Lawsuit. Further, in both the Canadian Lawsuit and the Osmak Lawsuit, Marchex has not taken any action to advance the litigation. Discovery has *not* begun in either case.

237.     Marchex's failure to report any of these purported losses, which Plaintiffs consider frivolous, in its public disclosures, indicates that Marchex either 1) did *not* suffer any of the losses it claims in either lawsuit, or 2) has not communicated the losses that it allegedly suffered to its shareholders, as it is required to do.

238.     Marchex has attempted to use the ill-advised filing of its SPA claims in the two Canadian lawsuits purely as leverage to intimidate Plaintiffs and Osmak into relinquishing their claims and abandoning their respective pursuit of claims against Marchex.

239.    Defendant committed a willful act in the use of process not proper in the regular conduct of the proceedings, by filing a lawsuit in Canada against Plaintiffs that was *clearly* within the scope of the SPA, and should have *only* been filed in Delaware.

240.    Defendant committed a willful act in the use of process by attempting to use the Canadian Lawsuit to coerce Osmak into dismissing his claims in the Osmak Lawsuit and to intimidate and deter Plaintiffs from pursuing the claims brought in this action.

241.    Defendant's actions, which were beyond the mere filing or maintenance of the lawsuit, were not a legitimate use of the judicial process. Defendant's actions were an act of coercion to harm designed to harm, harass and embarrass Plaintiffs and Mr. Osmak.

242.    Defendant's actions as described above were intentional, committed with knowledge of their impropriety.

243.    Plaintiffs have been and continue to be harmed by the Defendant's actions as described above, including but not limited to incurring attorney's fees and other expenses to litigate and defend the multiple litigations wrongfully initiated by Defendant.

**WHEREFORE**, Plaintiffs demands judgment in excess of $75,000.00, seek judgment against the Defendant for compensatory, direct, indirect, consequential, nominal, and punitive damages, along with attorney's fees, pre- and post-judgment interest, and such other relief as the Court may deem appropriate.

**GARIBIAN LAW OFFICES, P.C.**

*/s/ Antranig Garibian*
Antranig Garibian, Esquire (Bar No. 4962)
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE  19803
(302) 722-6885
ag@garibianlaw.com
*Counsel for Plaintiffs*