## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CHRIS BARNARD and SINC MCEVENUE, in their capacity as the Shareholder Representatives for the former shareholders of Telmetrics Inc.,** | : : : : : | **C.A. NO. 1:22-cv-01382-RGA** |
| Plaintiffs, | : : | |
| **v.** | : : | |
| **MARCHEX, INC.** | : : | |
| Defendant. | : | |

### SECOND AMENDED COMPLAINT

Plaintiffs, Chris Barnard and Sinc McEvenue, in their capacity as Shareholder Representatives of the former shareholders of Telmetrics Inc. ("Telmetrics" or "Company") under the November 5, 2018 Share Purchase Agreement ("SPA")[1] between Marchex, Inc. ("Marchex" or "Defendant"), Marchex CA Corporation, a Nova Scotia corporation (a wholly-owned subsidiary of Marchex), Telmetrics, a corporation formed pursuant to the laws of the Province of Nova Scotia, by way of this Second Amended Complaint, bring this action against Marchex, Inc. ("Marchex") and allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs (also referred to as "Shareholder Representatives") assert claims against Marchex on behalf of the former shareholders of Telmetrics ("Shareholders"), in Plaintiffs' capacity as the contractually designated representatives of the Shareholders.

---

[1] A true and correct copy of the SPA and the Escrow Agreement is attached hereto as Exhibit 1.

2.      Shareholders and Shareholder Representatives have suffered and continue to suffer damages as a direct and proximate result of Defendant's misconduct, breaches of the SPA, breaches of an escrow agreement ("Escrow Agreement"), and abuse of judicial process.

## PARTIES

3.      Plaintiffs, Chris Barnard and Sinc McEvenue, are shareholder representatives of the former shareholders ("Shareholders") of Telmetrics, Inc. ("Telmetrics" or "Company") under the SPA.

4.      Pursuant to §6.3 of the SPA, Plaintiffs have been designated as Shareholder Representatives and in that capacity, are vested with the power to transact matters of litigation on behalf of the Shareholders in connection with the SPA.

5.      Chris Barnard is a citizen of Canada.

6.      Sinc McEvenue is a citizen of Canada.

7.      Marchex Inc. is a Delaware corporation and is a citizen of the state of Delaware.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332, as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00[2], exclusive of interest and costs.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) and 1391(b)(3). The SPA provides that any action or proceeding arising under or in connection with the SPA shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware. *See* SPA, §11.10. The Escrow Agreement provides that any action or proceeding arising under or

---

[2] All dollar amounts referenced in this Second Amended Complaint are expressed in United States currency.

in connection with the Escrow Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware. *See* SPA, §6.5.

10.    Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions arising under or in connection with the SPA and irrevocably waived any objection to personal jurisdiction in Delaware. *See* SPA, §11.10.

11.    Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions arising under or in connection with the Escrow Agreement and irrevocably waived any objection to personal jurisdiction in Delaware. *See* Escrow Agreement, §6.5.

12.    Defendant agreed to irrevocably submit to the jurisdiction of the Delaware courts for purposes of actions to enforce the terms of the Escrow Agreement and irrevocably waived any objection to personal jurisdiction in Delaware. *See* Escrow Agreement, §§3.6, 6.5.

13.    In addition to seeking money damages, the SPA authorized Plaintiffs to seek specific performance and/or injunctive and/or equitable relief without the necessity of posting a bond or proving actual damages:

> 11.12  <u>Specific Performance</u>.  In addition to any and all other remedies that may be available at Law in the event of any breach of this Agreement, the parties hereto shall be entitled to specific performance of the agreements and obligations hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction, without the necessity of posting a bond or proving actual damages.

*See* SPA, §11.12.

## FACTUAL BACKGROUND

14.    This case arises out of Defendant's pervasive, blatant and egregious misconduct towards the Shareholder Representatives and Shareholders[3] since the November 5, 2018 closing of the SPA.

15.    Defendant has brazenly disregarded its obligations, acted with impunity and refused to conduct itself in good faith. As a result of Defendant's misconduct, Plaintiffs have been left with no choice but to file this action.

### *November 5, 2018 SPA*

16.    Marchex is a Seattle-based public company specializing in B2B call and conversation analytics. Marchex's business, in part, involves the use of artificial intelligence and machine learning to analyze conversation data between businesses and customers, providing customers with reporting designed to measure, among other things, the effectiveness of marketing programs.

17.    Telmetrics was similarly engaged in the analysis of conversation data between businesses and their customers for the purpose of assisting its clients in evaluating the effectiveness of their advertising campaigns.

18.    Marchex acquired Telmetrics for the purpose of adding Telmetrics' strength to Marchex's existing platform. This acquisition was accomplished through the November 5, 2018 SPA.

19.    The SPA closed on November 5, 2018 (the "Closing Date").

---

[3] In §12.1 of the SPA, the term "Seller" is defined as having the meaning set forth in the preamble to the SPA. The preamble to the SPA defines the Shareholders as those individuals listed on Exhibit A to the SPA and references each of them individually as "Seller." Accordingly, for purposes of this Second Amended Complaint, the terms "Shareholders" and "Sellers" shall refer to the Shareholders listed on Exhibit A to the SPA.

4

20.    Pursuant to the SPA, the purchase price of Telmetrics ("Purchase Price") was comprised of the following:

      a.      $10,100,000.00 as upfront cash consideration (the "Upfront Cash Consideration");

      b.      Up to $3,000,000.00 in cash based upon the achievement of targeted financial goals over two twelve-month periods (each, an "Earnout Period") following the closing date of the SPA (the "Earnout Consideration").

21.    The SPA defined the "Earnout Periods" as follows:

      a.      The first twelve months following the November 5, 2018 Closing Date (referred to herein as "First Earnout Period");

      b.      The second twelve months following the November 5, 2018 Closing Date (referred to herein as "Second Earnout Period").

22.    Within ninety (90) days after the end of the First Earnout Period, Defendant was required to pay the Earnout Consideration ($1,250,000.00) for the First Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA. *See* SPA, §1.2(b).

23.    Within ninety (90) days after the end of the Second Earnout Period, Defendant was required to pay the Earnout Consideration ($1,750,000.00) for the Second Earnout Period, provided that the Company met the Financial Goals set forth on Exhibit B to the SPA. *See* SPA, §1.2(b).

*Acceleration Events*

24.    On page 53 of the SPA, the SPA defined an "Acceleration Event" as any number

of events, as set forth below:

> "*Acceleration Event*" means any of the following: (a) Osmak is terminated without
> Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the
> first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its
> Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior
> the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in
> connection with the first Earnout Period has been earned as a result of achieving the applicable
> Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized
> run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized
> basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such
> Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not
> resigned without Good Reason or been terminated for Cause and the Parent reduces the
> Company's workforce to less than 35 employees without consent of the Shareholder
> Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or
> (e) the Company becomes subject to wind-up, liquidation or dissolution.

25.    Upon the occurrence of an Acceleration Event, §1.8(e) of the SPA provided as

follows:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then,
> following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an
> aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout
> Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject
> to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the
> applicable Earnout Period.

26.    If an Acceleration Event occurred during the First Earnout Period, Defendant was

obligated to pay, or cause to be paid, to the Shareholders an aggregate cash amount of

$3,000,000.00, within 90 days of November 5, 2019 (or February 3, 2020). *See* SPA, §1.2(e).

27.    If an Acceleration Event occurred during the Second Earnout Period, Defendant

was obligated to pay, or cause to be paid, to the Shareholders an aggregate cash amount of

$1,750,000.00, within 90 days of November 5, 2020 (of February 3, 2021). *See* SPA, §1.2(e).

### *Marchex's Obligations Regarding the Operation of the Company*

28.    Pursuant to §1.8(a) of the SPA, Marchex was obligated to 1) carry on the Company's business in the ordinary course, 2) act in good faith with respect to the operation of the Company's business and 3) act in a commercially reasonable manner with respect to operation of the Company's business.

29.    Pursuant to §1.8(a) of the SPA, Marchex was further obligated to cause each of its subsidiaries not to, and require each of its respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business in bad faith with the principal purpose of (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period or (ii) having a material direct negative effect on the Company's revenue or OIBA[4] for purposes of achieving the Financial Goals.

30.    Specifically, §1.8(a) provided as follows:

> 1.8    <u>Earnout</u>.
>
>      (a)    Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

31.    Pursuant to §1.8(c), Marchex had an obligation under the SPA to give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its "Subsidiaries" and their accountants to

---

[5] The Escrow Agreement is Exhibit C to the SPA.

enable the Shareholder Representatives to exercise all of their rights under §1.8. See SPA, §1.8(c).

### *Earnout Statements*

32.     Pursuant to §1.8(b) of the SPA, no later than 75 days following the conclusion of each Earnout Period, Defendant was obligated to prepare and deliver the following to Plaintiffs:

      a.     An "Earnout Statement" (specifically defined in the SPA as a "statement calculating whether Financial Goals have been achieved");

      b.     such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.

33.     Specifically, §1.8(b) of the SPA provided as follows:

> (b)     The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.  For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

34.     Once Defendant provided an "Earnout Statement" and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request, Marchex and the Shareholder Representatives were obligated to attempt to resolve any agreements over an Earnout Statement in good faith. *See* SPA, §1.8(c).

35.     Section 1.8(c) provided as follows:

> (c)     If the Shareholder Representatives disagree with an Earnout Statement, the Shareholder Representatives shall notify the Parent on or before the date fifteen (15) days after the date on which the Parent delivers to the Shareholder Representatives such Earnout Statement, failing which such Earnout Statement shall be deemed to be accepted by the Sellers with respect to the corresponding Earnout Period.  The Parent and the Buyer shall give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under this Section 1.8.  The Parent and the Shareholder Representatives shall attempt to resolve any such disagreements in good faith.  If the
>
> CAN: 28618682.8
>
> 5
>
> Parent and the Shareholder Representatives are unable to resolve all such disagreements on or before the date fifteen (15) days following notification by the Shareholder Representatives of any such disagreements, the Parent shall retain the Final Accounting Firm to resolve all such disagreements, who shall adjudicate only those items still in dispute with respect to the Earnout Statement.

36.    If a dispute over an Earnout Statement could not be resolved on or before the date 15 days following notification by the Shareholder Representatives of any such disagreements, **Defendant** was obligated to retain an accounting firm ("Final Accounting Firm") for the limited and sole purpose of resolving disagreements over the Earnout Statement. *See* SPA, §1.8(c).

37.    The SPA did not provide that the Final Accounting Firm was intended to resolve all disagreements that arose under the SPA. Rather, per Section 1.8(c) of the SPA, the Defendant was obligated to retain the Final Accounting Firm for one sole and limited purpose - to *"only adjudicate those items still in dispute with respect to the Earnout Statement."*

### *The Escrow Agreement*

38.    As primary security for Shareholders' indemnification obligations under Article X of the SPA, Marchex was required to deposit $1,010,000.00 in escrow (the "Escrow Deposit") on behalf the Shareholders (i.e., 10% of the Upfront Cash Consideration). *See* SPA, §1.5. The Escrow Deposit was to be held and eventually disbursed to Plaintiffs by an escrow agent (U.S.

Bank National Association) ("Escrow Agent") in accordance with the terms of a separate

agreement ("Escrow Agreement")[5] and the SPA. *See* SPA, §1.5.

39.     The Escrow Deposit was to be held until the "Escrow Release Date," the 18th

month anniversary of the Closing Date, or May 5, 2020. *See* SPA, §1.5, SPA, §12.1.

40.     In the event of the occurrence of an event which Marchex asserted as an

"Indemnifiable Matter," §3.2 of the Escrow Agreement required that Marchex notify the

Plaintiffs and the Escrow Agent via a "Claim Notice".

41.     In order for a Claim Notice to be valid, Section 3.2 of the Escrow Agreement

contained conditions precedent which required Defendant to 1) *promptly* notify Plaintiffs and the

Escrow Agent of an event which Defendant asserts constitutes an "Indemnifiable Matter" and to

set forth the basis of such a claim, 2) set forth the good faith estimate of the reasonably

foreseeable maximum amount of its claim for indemnification, 3) set forth the basis of the claim,

and 4) make available to the Shareholder Representatives *all relevant information* regarding such

"Indemnifiable Matter" which was in the possession of Defendant.

42.     The SPA (§12.1) and the Escrow Agreement (§3.1) further provided that in the

event that there were no escrow claims during the first 12 months following the November 5,

2018 Closing Date, that the Escrow Deposit would be reduced to $250,000.00 and that

$760,000.00 would be promptly delivered to the Shareholders via the Shareholder

Representatives (Plaintiffs).

43.     Alternatively, in the event that a valid Claim Notice *was* delivered in compliance

with the requirements and conditions precedent of the SPA and Escrow Agreement, the SPA

(§1.5) and Escrow Agreement provided merely that in such a circumstance, the Escrow Deposit

---

[5] The Escrow Agreement is Exhibit C to the SPA.

was to remain in the custody of the Escrow Agent for so long as was reasonably necessary to satisfy any claim for indemnification.

44.    Pursuant to §3.6 of the Escrow Agreement, any disputes regarding an "Indemnifiable Matter" were to be settled in accordance with the Share Purchase Agreement.

45.    Pursuant to §3.7 of the Escrow Agreement, where a valid Claim Notice referenced Indemnifiable Matters that were 1) not absolute as to liability or 2) not liquidated as to amount, as a condition precedent to withholding funds related to any such claims from the Shareholders, Defendant was required to send a "Notice to Withhold" to the Escrow Agent and the Shareholder Representatives to notify the Escrow Agent and the Shareholder Representatives of the amount, if any, to be retained after the Escrow Release Date (May 5, 2020) on account of Indemnifiable Matters concerning which Defendant had validly given the Claim Notice specified in §3.2 of the Escrow Agreement.

46.    If there *were* escrow claims during the First Earnout Period, the Escrow Agreement (§3.1) provided that after the First Earnout Period, the Escrow Agent would reduce the Escrow Deposit to $250,000.00, plus such amount in consideration of the amount set forth in a notice delivered pursuant to §3.2 **and** as reasonably required as provided in §3.7 of the Escrow Agreement. Any balance was required to be released *promptly* to the Shareholder Representatives. *See* Escrow Agreement, §3.1.

47.    Pursuant to §3.7 of the Escrow Agreement, in the event that Defendant "does not provide the notice required by this Section 3.7, (a) all claim notices received by Sellers or the Escrow Agent from [Marchex, Inc.] pursuant to Section 3.2 shall be void and of no further effect and (b) all remaining funds held in the Escrow Deposit shall be distributed by the Escrow Agent to the Shareholder Representatives promptly after the Escrow Release Date in accordance with

Section 3.8 notwithstanding any previously received claim notice given by [Marchex, Inc.] pursuant to Section 3.2."

## *Disputes Between the Parties*

### Financial Goals

48.     In September 2019, it became apparent to Plaintiffs that Marchex was refusing to cooperate with the Shareholder Representatives' requests to provide information regarding the operations of the Company. Eventually, it would become clear to Plaintiffs that Marchex had no intention of paying *any* portion of the $13,100,000.00 Purchase Price, beyond the $9,000,000.00 initially paid by Defendant. In effect, Marchex acted in bad faith after the closing of the SPA to wrongfully obtain for itself a 30.76% discount on the price it had agreed to pay for the Company.

49.     The Shareholder Representatives' concern was precipitated in part by the fact that Andrew Osmak ("Osmak"), who had been the Company's CEO and *de facto* head of sales, was on an extended medical leave, as a result of misconduct on the part of Marchex's management.

50.     Moreover, the Shareholder Representatives were also gravely concerned about Defendant's management of the Company and the strategic direction of the Company, particularly given the fact that no acting CEO had been put in place by Marchex, during Osmak's absence.

51.     Accordingly, on September 10, 2019, Mr. Barnard, as he was entitled to under §1.8(c) of the SPA, communicated to Defendant and specifically requested that Defendant provide the following information:

    a.     Information regarding who was managing the strategic direction and the operations of the Company in Andrew Osmak's absence;

b.      Information regarding who was maintaining the Company's client
relationships and working on business development and sales initiatives
that Mr. Osmak had in place prior to the commencement of his medical
leave;

c.      A list of the Company's management team;

d.      The Company's business plan;

e.      An update on how the Company was tracking in relation to the Financial
Goals (as defined in the SPA);

f.      An overview of the strategy for maximizing the Company's revenue;

g.      An overview of any steps that had been taken or were planned with
respect to integration of Marchex and the Company that may have
impacted the Company's achievement of its stated revenue goals;

h.      An explanation of the circumstances surrounding the medical leave of the
Company's CEO, Andrew Osmak.

52.     Despite its obligation to do so, Marchex refused to provide Mr. Barnard and Mr.
McEvenue with sufficient information about the Company in order to enable them to evaluate
either the Company's performance or whether it was being operated as required by Section
1.8(a) of the SPA.

53.     Marchex's obligation to provide reasonable access to the books and records and
working papers under §1.8(c) of the SPA was *not* limited to earnout disputes – nor was it
temporally limited to after an earnout statement was provided. There was no mandate whatsoever
in the SPA, nor can Marchex identify any such provision, to support the contention that Plaintiff
had no right to information before each earnout statement was due.

54.     On September 13, 2019, Defendant, through its general counsel, Michelle

Paterniti ("Paterniti"), refused to provide any of the requested information based on the false

pretext that the requested information constituted non-public financial and operational

information regarding the Telmetrics business and could not be disclosed pursuant to U.S.

securities laws.

55.     On November 1, 2019, Defendant sent a correspondence pursuant to which

Defendant would be requesting a portion of the Escrow Deposit.

56.     Although Defendant attempted to characterize the document as a "Claim Notice"

under the SPA, this correspondence did not satisfy the conditions precedent to constitute a valid

"Claim Notice" under the SPA for the following reasons:

a.      The November 1, 2019 document was not sent promptly after the

occurrence of the alleged occurrence of the Indemnifiable Matter;

b.      The November 1, 2019 document did not set forth the good faith estimate

of the reasonably foreseeable maximum amount of its claim for

indemnification

c.      The November 1, 2019 document did not set forth the basis of the claim,

d.      The November 1, 2019 document, did **<u>not</u>** identify any *actual* losses that

occurred. Rather, this correspondence merely stated that there were

"Losses relating to the Indemnification Claims" which "**<u>may have</u>**

**<u>occurred</u>**".

e.      The November 1, 2019 document, did **<u>not</u>** identify any *actual* losses that

occurred. Rather, this correspondence merely stated that there were

14

"Losses relating to the Indemnification Claims" which "**may have occurred**".

  f. The November 1, 2019 document did not contain a determination of any Losses and merely referenced "estimated Losses in excess of US$760,000".

57. Moreover, based on the November 1, 2019 document, the purported "indemnifiable matters" were not absolute as to liability nor were they liquidated as to amount.

58. On November 10, 2019, Mr. Barnard sent a correspondence to Defendant, as required by the Escrow Agreement, disputing the validity of the November 1, 2019 correspondence. Mr. Barnard confirmed that the Shareholder Representatives (1) categorically denied any breach of any representation under the SPA; (2) disputed that a valid "Claim Notice" had been delivered (due in part to the fact that Defendant had only referred to losses that "may" occur in the future and had not identified any *actual* losses or provided the supporting documentation required by the SPA); (3) requested immediate release of the Escrow Deposit (less $250,000.00); and (4) reiterated the Shareholder Representatives' request for disclosure of information that Defendant was required to release pursuant to the SPA.

59. Plaintiffs further notified U.S. Bank ("Escrow Agent") that they disputed the November 1, 2019 "Claim Notice" and advised the Escrow Agent that no amount of the Escrow was to be released to Defendant. The Escrow Agent responded to Mr. Barnard, advising that the funds would remain in escrow until the claim was jointly resolved by the parties.

60.     On November 13, 2019, Mr. Barnard corresponded to Paterniti asking when the Escrow Deposit would be released, as well as when Shareholder Representatives would receive a response to their request for information relating to the Financial Goals.

61.     On November 19, 2019, Mr. Barnard corresponded to Defendant's representatives, Mike Arends and Russell C. Horowitz, following up on the requests for the information required by §1.8 of the SPA and further reiterating that the Escrow Deposit should be released immediately.

62.     On November 26, 2019, in an email, Defendant, through Paterniti, rejected Shareholder Representatives' requests for information.

**Disputes over the First Earnout Statement**

63.     On January 15, 2020, Mr. Barnard corresponded to Defendant, as follows:

    a.     Following up on the September 10, 2019 request for information;

    b.     Requesting a full company organizational chart highlighting any and all employees, contractors, or consulting resources present in the Company during the First Earnout Period, highlighting which of those resources were specifically dedicated 100% to executing Company's operating plan at any time during the First Earnout Period per Section 1.8(a) of the SPA, versus ongoing integration efforts with other Marchex controlled entities;

    c.     Reminding Defendant that Plaintiffs were still not in receipt of the funds from escrow that were due pursuant to the SPA and Escrow Agreement.

64.     Subsequent to this request, Defendant sent an Earnout Statement ("First Earnout Statement") dated January 16, 2020 for the First Earnout Period. Defendant claimed that the Earnout Consideration was not payable for the First Earnout Period, claiming that the minimum

revenue threshold was not achieved. The correspondence further stated that the information contained in the First Earnout Statement was to be kept strictly confidential – a position now revealed to have been patently pretextual, due to the fact that Defendant has filed the First Earnout Statement (*and* the Second Earnout Statement referenced below) as part of the public record in this action.

65.    On January 17, 2020, Mr. Barnard corresponded to Defendant, reiterating his previous requests for information. Mr. Barnard acknowledged that any confidential information in the First Earnout Statement contained confidential information would be appropriately treated as such by the Shareholder Representatives. Mr. Barnard's correspondence further pointed out that confidentiality was not a valid reason or basis for withholding information, as the First Earnout Statement itself contained confidential information.

66.    On January 24, 2020, Paterniti, on behalf of Defendant, distributed to Plaintiffs, by email, a one-page document to serve as "additional detail" in support of the First Earnout Statement. Paterniti further stated that the various types of information requested by Plaintiffs, relating to the operations of Telmetrics, were "inappropriate."

67.    On February 1, 2020, Shareholder Representatives, through counsel, sent written notice to Defendant to advise that Defendant was in breach of §1.8(b) of the SPA in that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with the First Earnout Statement. This correspondence further advised that the Shareholder Representatives disputed the First Earnout Statement and that the Shareholder Representatives did not accept the First Earnout Statement.

68.    The February 1, 2020 correspondence further reiterated Shareholder Representatives' request for information dated September 10, 2019 and January 15, 2020. As

stated in the correspondence, Defendant had failed to provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2019 conclusion of the First Earnout Period. As explained in the February 1, 2020 correspondence, the information had been requested by the Shareholder Representatives in order to enable them to evaluate the financial results set out in the First Earnout Statement, whether the business of the Company had been carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner, as required by §1.8(a) of the SPA.

69.    Despite knowing that these matters remained in dispute, Defendant did not respond to Plaintiffs' information requests, did not work in good faith to resolve Plaintiffs' disagreements with the First Earnout Statement, and never retained a Final Accounting Firm – as it was obligated to do under the SPA.

**Disputes over the Second Earnout Statement**

70.    In January 2021, Defendant sent an Earnout Statement for the Second Earnout Period ("Second Earnout Statement").[6] Defendant claimed that the Earnout Consideration was not payable for the Second Earnout Period, claiming that the minimum revenue threshold was not achieved. The correspondence further stated that the information contained in the Second Earnout Statement was to be kept strictly confidential.

71.    On January 18, 2021, Plaintiffs' counsel notified Defendant, through counsel, of the following:

a.    That Plaintiffs disputed the Second Earnout Statement with respect to the Second Earnout Period;

---

[6] The correspondence from Defendant was mistakenly dated January 14, 2020, despite the fact that the correspondence was actually being written in January 2021.

b.      That Defendant remained in breach of the SPA for failing to provide information reasonably requested by the Shareholder Representatives in connection with the First Earnout Period;

c.      That Defendant risked a second and distinct breach of the SPA with respect to information reasonably requested by Shareholder Representatives and required in order to evaluate the Second Earnout Statement. Specifically, the information requests made on September 10, 2019, January 15, 2020 and February 1, 2020 sought information required in order to evaluate the financial results set out in both the First and Second Earnout Statements and to follow up with additional specific and reasoned information requests;

d.      That the information requested by the Shareholder Representatives was required to evaluate the financial results set forth in both the First and Second Earnout Statements, which were necessarily impacted by whether the business of the Company was carried on in the ordinary course and whether Defendant had acted in good faith and in a commercially reasonable manner with respect to the Company's business, as required by Section 1.8(a) of the SPA;

e.      That information requests had been made September 10, 2019, January 15, 2020, and February 1, 2020 – but to no avail. Plaintiffs' counsel again reiterated these requests.

72.     Defendant did not at any time offer any response to requests for information

beyond that which was contained in the First and Second Earnout Statements. Defendant merely

responded with obfuscation and denials.

73.     Shareholder Representatives attempted to comply with their responsibilities under

the SPA. On the other hand, Defendant, knowingly and in bad faith, withheld information

reasonably requested by Shareholder Representatives. As a result of Defendant's misconduct, the

Shareholder Representatives were prevented from exercising their rights under §1.8 of the SPA.

74.     Defendant received notification by the Shareholder Representatives regarding

their disagreements with respect to the First Earnout Statement and Second Earnout Statement,

and Shareholder Representatives' disagreement with respect to Defendant's refusal to provide

information to enable the Shareholder Representatives to exercise their rights under Section 1.8

of the SPA.

75.     Defendant did not attempt in good faith to resolve Plaintiffs' disagreement with

either the First Earnout Statement or the Second Earnout Statement. As a result, Plaintiffs and

Defendant were unable to resolve their disagreements on or before the date 15 days following

notification by the Shareholder Representatives of the disagreements. At that point, pursuant to

Section 1.8(c) of the SPA, Defendant was under a mandatory obligation to retain the "Final

Accounting Firm."

76.     Defendant knew that these disputes remained an unresolved issue between

Plaintiffs and Defendant. Not only did Defendant know this from the detailed correspondences

received from Mr. Barnard and from Plaintiffs' legal representatives throughout 2019, 2020 and

early 2021, but throughout 2021 and 2022, representatives of Plaintiffs repeatedly and

consistently communicated with Defendant in an attempt to resolve the disputes surrounding the

SPA, including but not limited to Marchex's wrongful taking of escrow funds, refusal to provide information and failure to provide any information in response to repeated requests.

77.    Since January 2021 and for the time period up to the filing of this action, multiple representatives of Plaintiffs, including other shareholders, repeatedly attempted to work with Marchex's representatives to resolve these disputes. Despite knowing that these matters remained in dispute, Defendant did not respond to Plaintiffs' information requests, did not work in good faith to resolve Plaintiffs' disagreements with the First and Second Earnout Statements, and despite its contractual obligation to do so, Defendant never retained the "Final Accounting Firm" to resolve the disputes over the First Earnout Statement or Second Earnout Statement.

**Dispute over Escrow Deposit**

78.    On November 1, 2019, Defendant circulated what was purported to be a "claim" (dated November 1, 2019), vaguely referencing supposed "indemnity claims" under the SPA, concluding with Defendant's unsupported and speculative estimate that the total "claim" amount would be in excess of $760,000.

79.    Defendant provided no detail or support for what it characterized as its "estimated losses." Defendant failed to provide the required relevant information or a good faith estimate of the reasonably foreseeable maximum amount of the alleged claims, which were *not* limited to $1,010,000. Pursuant to §10.4(a), "Excluded Obligations" and fraud provided a basis for the liability of Sellers to potentially exceed $1,010,000.00.

80.    Significantly, the items referenced in the November 1, 2019 correspondence as "Indemnifiable Matters" were 1) *not* absolute as to liability and 2) *not* liquidated as to amount.

81.    On November 4, 2019, Paterniti sent an email to McEvenue and Barnard, attaching the November 1, 2019 correspondence.

82.     On November 10, 2019, Mr. Barnard, on behalf of Plaintiffs, advised Defendant that the November 1, 2019 correspondence was *not* a "Claim Notice" under the SPA, pointing out that Defendant's November 1, 2019 letter had only vaguely described uncertain, possible losses that "may" occur in the future and that Defendant had not provided any of the requisite information to meet the conditions precedent for a valid Claim Notice under the SPA and Escrow Agreement to justify withholding any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA) be released.

83.     On November 13, 2019, Mr. Barnard corresponded to Paterniti asking when the Escrow Deposit would be released, as well as when Shareholder Representatives would receive a response to their request for information relating to the Financial Goals.

84.     Plaintiffs also corresponded to the Escrow Agent, U.S. Bank ("Escrow Agent"), that no amount of the Escrow Deposit was to be released to Defendant. The Escrow Agent responded to Mr. Barnard, confirming that the funds would remain in escrow until the claim was jointly resolved by the parties.

85.     On February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. Bank, demanding that, pursuant to §3.3 of the Escrow Agreement, that the Escrow Agent send the disputed $760,000.00 to *Defendant*. Defendant, however, was *not* entitled to demand this release under either the SPA or the Escrow Agreement due to its failure to satisfy the necessary conditions precedent for a valid Claim Notice under §3.2.

86.     Defendant had failed to 1) *promptly* notify Plaintiffs and the Escrow Agent of an event which Defendant asserts constitutes an "Indemnifiable Matter" and to set forth the basis of such a claim, 2) set forth the good faith estimate of the reasonably foreseeable maximum amount of its claim for indemnification, 3) set forth the basis of the claim, and 4) make available to the

Shareholder Representatives *all relevant information* regarding such "Indemnifiable Matter" which was in the possession of Defendant.

87.     Accordingly, Defendant's request was a breach of the Escrow Agreement, as Defendant never sent a valid "Claim Notice."

88.     Even *if* a Claim Notice had been validly presented (which Plaintiffs deny), and the claims had not been disputed (which Plaintiffs deny), §3.3 of the Escrow Agreement only permitted Defendant to demand that the Escrow Agent retain for future return to Defendant, as and when the amount was determined pursuant to the Escrow Agreement. That amount, however, was *never determined* and still to this today, is neither i) absolute as to liability, nor ii) liquidated as to amount.

89.     As of February 3, 2020, however, based on Defendant's November 1, 2019 correspondence, there were no losses that were alleged to have actually occurred, as the November 1, 2019 correspondence merely contained a referenced to losses that "may have" occurred. The November 1, 2019 correspondence did *not* identify a single Indemnifiable Matter which was either i) absolute as to liability, or ii) liquidated as to amount. Accordingly, on or before the Escrow Release Date (May 5, 2020), Defendant was required to send a Notice to Withhold, pursuant to §3.7 of the Escrow Agreement. Defendant never sent the required Notice to Withhold with respect to the $760,000.00 subject to the November 1, 2019 correspondence, thus invalidating the November 1, 2019 correspondence as a "Claim Notice" – which Plaintiffs deny that it ever was.

90.     Nevertheless, despite the fact that it was not entitled to do so, Defendant deliberately delivered the February 3, 2020 request by hand to the Escrow Agent, and sent it to the Shareholder Representatives only by mail, knowing full well that there would be a

considerable delay between the hand-delivered notice and the notice by mail, intentionally and effectively depriving the Shareholder Representatives of the ability to respond.

91.    As intended by Defendant, the Shareholder Representatives did not receive the February 3, 2020 demand by Defendant until *February 13, 2020*. The Escrow Agreement provided that all notices and communications under the Escrow Agreement were deemed given *when* received. *See* Escrow Agreement, §6.3. Thus, Defendant's February 3, 2020 correspondence was not "given" to the Shareholder Representatives until February 13, 2020.

92.    The Shareholder Representatives received Defendant's correspondence demanding release of the $760,000.00 from the Escrow Deposit on February 13, 2020, *ten days* after the $760,000.00 had already been improperly released to Defendant by U.S. Bank. Although Defendant's scheme worked, the conduct was wrongful, willful and in breach of both the SPA and the Escrow Agreement.

93.    On February 14, 2020, one day after receipt, Plaintiffs' counsel again notified both the Escrow Agent and Defendant that the original November 1, 2019 letter was *not* a valid "Claim Notice" and that Plaintiffs did *not* agree to the release of the Escrow Deposit. Plaintiffs' counsel's correspondence noted, among other things, that Defendant had delivered an invalid Claim Notice, that Plaintiffs had communicated their position that the Claim Notice was invalid to Defendant on November 10, 2019, and that the Escrow Deposit should have been released to the *Shareholder Representatives*. Plaintiffs' counsel's February 14, 2020 correspondence further pointed out that the Escrow Agent was required to have a written agreement signed by both Plaintiffs and Defendant for any release of the Escrow Deposit, or a final decision with respect to the alleged Indemnifiable Matters in order to release the Escrow Deposit.

94.     Defendant's demand for a release of the Escrow Deposit in the face of a dispute with respect to the validity of the Claim Notice was improper and further evidenced Defendant's bad faith conduct in connection with the SPA and the Escrow Agreement.

95.     Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

96.     On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had already sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

97.     On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

98.     On May 1, 2020, Defendant's counsel sent to the Shareholder Representatives an "Updated Claim Notice" – demanding that the Escrow Agent retain the remaining $250,000.00 of the Escrow Deposit.

99.     In the May 1, 2020 correspondence, Defendant also requested, pursuant to §3.7 of the SPA, that the Escrow Agent withhold $250,000.00 remaining in the custody of the Escrow Agent – without making any reference to any of the claims or amounts set forth in the November 1, 2019 correspondence. Significantly, up until the May 1, 2020 request for release of the $760,000.00, Defendant had *never* sent the required Notice to Withhold, required by §3.7 of the Escrow Agreement. Defendant's failure to do so rendered the November 1, 2019 *void* as a claim notice, as expressly mandated by §3.7 of the Escrow Agreement, which states that in the event that Defendant "does not provide the notice required by this Section 3.7, (a) all claim notices received by Sellers or the Escrow Agent from [Marchex, Inc.] pursuant to Section 3.2 shall be void and of no further effect.

25

100.    On May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, disputing the May 1, 2020 "Updated Claim Notice", demanding immediate release of the remaining $250,000.00 of the Escrow Deposit and reserving the previous dispute regarding the improper release of the $760,000.00 to Defendant. This correspondence stated that the "Updated Claim Notice" - like the November 1, 2019 letter - was not a valid Claim Notice due to the fact that it merely vaguely referenced possible losses that "may occur" and did not refer to any "losses" within the meaning of the SPA. This correspondence also pointed out that Defendant had failed to provide the required relevant information or a good faith estimate of the reasonably foreseeable maximum amount of the alleged claims. Pursuant to §10.4(a), "Excluded Obligations" and fraud provided a basis for the liability of Sellers to potentially exceed $1,010,000.00.

101.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent.

102.    In the absence of agreement and joint instruction by the parties, in order to be entitled to any amount of the Escrow Deposit, Defendant was required to obtain a final determination of its rights with respect to the Escrow Deposit, as set forth in §3.6 of the Escrow Agreement. Defendant has not done so.

103.    Defendant's conduct with respect to the Escrow Deposit constitutes a breach of Defendant's obligations under the SPA and the Escrow Agreement.

104.    Defendant not only wrongfully caused the Escrow Agent to release $760,000.00 to *Defendant*, without delivering a valid Claim Notice, but Defendant also wrongfully caused the Escrow Agent to withhold the remaining $250,000.00, in breach of §1.5 of the SPA and in breach of the Escrow Agreement.

105.    Defendant's breaches of the SPA and the Escrow Agreement have damaged Plaintiffs, who are entitled to be paid the entire Escrow Deposit.

106.    Defendant's scheme to obtain the Escrow Deposit, without notice to the Shareholder Representatives and without establishing entitlement to such funds was underhanded, egregious, reckless, reprehensible, malicious, and in bad faith.

### *Plaintiffs' Request for Punitive Damages*

107.    Plaintiffs' claims for punitive damages are based upon the facts set forth throughout this Second Amended Complaint and include, but are not limited to, the following allegations.

108.    Punitive damages seek to punish the defendant for behavior and conduct that is considered egregious, reckless, reprehensible, or filled with malice.

109.    Under Delaware law, punitive damages are recoverable where the defendant's conduct exhibits a wanton or willful disregard for the rights of the plaintiff.

110.    For a defendant's conduct to be found willful or wanton, the conduct must reflect a conscious indifference or "I don't care" attitude.

111.    Defendant's conduct with respect to the SPA and the Escrow Agreement was knowing, intentionally and performed with the *specific* intent to deprive Plaintiffs of the benefits of the SPA (i.e., the funds held in Escrow and the Earnout Consideration) – and demonstrating no regard whatsoever for the consequences of its misconduct or the process set forth in the SPA and the Escrow Agreement.

112.    When analyzing a punitive damages award, Delaware courts consider whether:

      a.    the harm caused was physical as opposed to economic;

     b.     the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

     c.     the target of the conduct had financial vulnerability;

     d.     the conduct involved repeated actions or was an isolated incident; and,

     e.     the harm was the result of intentional malice, trickery, or deceit, or mere accident.

113. Defendant, a publicly traded corporation, knew that receiving the payment under the SPA was significant to the Plaintiffs, and purposely capitalized on that, engaging in malicious, intentional, fraudulent, unreasonable, willful and wanton and conduct  - with a complete disregard for the rights of Plaintiffs – and at all times designed to prevent *any* funds from being paid to Plaintiffs and to cause Plaintiffs to spend as much of their own money as possible.

114. Defendant has consistently conducted itself in bad faith since the closing of the SPA, as detailed herein, with the intent to deprive Plaintiffs of the benefits of the SPA.

115. During the course of the transactions, Defendant consistently and openly flouted its obligations under the SPA, generally completely ignoring Plaintiffs' attempts to communicate with them and request information. Defendant's observance only of the provisions of the SPA and the Escrow Agreement that inured to the benefit of Defendant lacked any indicia of good faith and failed to meet the minimum standards required under the SPA and the Escrow Agreement. Defendant provided little to no information, and then exacerbated the situation by openly stonewalling and responding to any requests made by Plaintiffs or their attorneys with pretextual excuses.

116.    Defendant, through its representatives, has sent correspondences in order to create the appearance of compliance with the SPA which, in reality, contained no actual information and certainly *not* the information required by the SPA and/or the Escrow Agreement.

117.    Defendant, through its representatives, has at each step undermined the spirit and letter of both the SPA and the Escrow Agreement, in order to reap as much money and profit – without regard to any actual entitlement – under the SPA.

118.    Defendant concocted and executed an unjustified scheme to disrupt the operations of the Company, as detailed in this Second Amended Complaint, divert its customers to Marchex and starve the Company of revenue – all for the purpose of reaping as much money as it could for itself to avoid its obligation to pay the Earnout Consideration under the SPA.

119.    Defendant concocted and executed an unjustified scheme to obtain control over and possession over the funds from the Escrow Deposit, which rightfully belonged to Plaintiffs and should have been paid entirely to Plaintiffs as Upfront Consideration – but for *limited* circumstances. In doing so, Defendant exerted pressure over the Escrow Agent, despite clearly not having complied with either the express terms or spirit of the Escrow Agreement and SPA.

120.    The timing and chronology of Defendant's conduct demonstrates intentional and knowing delay, perpetrated with the specific intent to prejudice Plaintiffs and inhibit and/or prevent them from adequately protecting their own interests with respect to either the Earnout Consideration, or the amounts due from the Escrow Deposit.

121.    Moreover, Defendant intended to, and in fact, did willfully mislead and coerce the Escrow Agent by making material misrepresentations and/or omitting material facts, in demanding that the Escrow Agent transfer funds to Defendant from the Escrow Deposit and

pressuring the Escrow Agent to change from its original position – which was to hold the $760,000.00 in escrow while the parties resolved their differences.

122.    Defendant's misconduct was intended to pressure, coerce and mislead the Escrow Agent into believing that Defendant had "ownership" over funds held in escrow when, in fact, those funds did *not* belong to Defendant, belonged to Plaintiffs and were merely held in escrow to provide security for very specific and limited indemnity claims (none of which have ever been established by Defendant).

123.    Defendant's outrageous conduct has left Plaintiffs in the position of having to bring this action in order to simply obtain the relief afforded to them under the SPA.

124.    At no point did Defendant conduct itself with *any* measure of good faith.

125.    Based on the foregoing, Plaintiffs will request an award of punitive damages.

126.    In determining any award of punitive damages, a finder of fact may consider the nature of Defendant's conduct and the degree to which the conduct was reprehensible.

127.    A finder of fact may assess an amount of punitive damages that will deter Defendant and others like Defendant from similar conduct in the future.

128.    A finder of fact may consider Defendant's financial condition when evaluating deterrence.

129.    Based on the foregoing and the conduct described throughout this Second Amended Complaint, in light of the compensatory damages suffered by Plaintiffs as requested herein, and in light of Defendant's financial condition, Plaintiffs are entitled to an award of punitive damages, in excess of $20,000,000.00.

## COUNT I

## BREACH OF CONTRACT

## (ACCELERATION EVENT)

130.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein at length.

131.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

132.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

133.    Pursuant to Section 1.8(e) of the SPA, upon the occurrence of an Acceleration Event (defined in the SPA), Defendant was obligated to make certain payments to Plaintiffs. Section 1.8(e) of the SPA provides the following:

> (e)    If, during an Earnout Period, an Acceleration Event occurs, then, following the occurrence of an Acceleration Event, the Parent shall pay, or cause to be paid, an aggregate cash amount to the Shareholder Representative equal to: (i) during the first Earnout Period, $3,000,000; and (ii) during the second Earnout Period, $1,750,000, in each case, subject to any adjustment pursuant to Section 1.4(c)(iv), within ninety (90) days after the end of the applicable Earnout Period.

134.    On page 53 of the SPA, an "Acceleration Event" was defined, as set forth below:

> "*Acceleration Event*" means any of the following: (a) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason prior the end of the first Earnout Period; (b) (i) Osmak is terminated without Cause by the Company (or any of its Affiliates) or resigns for Good Reason after the completion of the first Earnout Period but prior the end of the second Earnout Period; (ii) all or a part of the Earnout Consideration payable in connection with the first Earnout Period has been earned as a result of achieving the applicable Financial Goals; and (iii) Revenue or OIBA during the second Earnout Period on an annualized run rate basis (based on a twelve (12) month trailing average extrapolated on an annualized basis) is equal to or greater than the lowest revenue minimum or OIBA threshold for such Second Earnout Period as shown in Exhibit B of the Definitive Agreement; (c) Osmak has not resigned without Good Reason or been terminated for Cause and the Parent reduces the Company's workforce to less than 35 employees without consent of the Shareholder Representatives; (d) the Company ceases to operate the Business of the Company for reasons; or (e) the Company becomes subject to wind-up, liquidation or dissolution.

### *Acceleration Event – Provision (c) Reduction of Work Force*

135.    During either the First Earnout Period or Second Earnout Period, Defendant reduced the Company's workforce to less than 35 employees **without** the consent of the Shareholder Representatives. Further, this reduction took place without Osmak having been terminated for Cause or having resigned without Good Reason. This constituted an Acceleration Event pursuant to the §12.1(c).

136.    Accordingly, Defendant's reduction of the Company's workforce to less than 35 employees without the consent of the Shareholder Representatives constituted an Acceleration Event under the SPA.

137.    Payment pursuant to Section 1.8(e) was either due within 90 days of November 5, 2019 (or February 3, 2020) or within 90 days of November 5, 2020 (or February 3, 2021), depending on *when exactly* Defendant reduced the Company's workforce to less than 35 employees without consent of the Shareholder Representatives.

138.    Pursuant to the SPA, if the Company's workforce was reduced to less than 35 employees during the First Earnout Period, Defendant was obligated to pay $3,000,000.00 to Plaintiffs. *See* SPA, §1.8(e).

139.    Pursuant to the SPA, if the Company's workforce was reduced to less than 35 employees during the Second Earnout Period, Defendant was obligated to pay $1,750,000.00 to Plaintiffs. *See* SPA, §1.8(e).

140.    Defendant breached Section 1.8(e) of the SPA by failing to make the payment as required due to the occurrence of this Acceleration Event, causing Plaintiffs to suffer money damages, in an amount equal to the amounts to be determined in accordance with §1.8(e) of the SPA, in an amount equal or greater to $1,750,000.00.

141.    From information available from the Company's public disclosures, Plaintiffs believe that the Company's workforce dropped below 35 employees during either the First or Second Earnout Period.

142.    Plaintiffs' belief is partially based upon information in Defendant's publicly available annual report. In this report, for the fiscal year ending December 31, 2020, it indicates that a "subsidiary" received approximately $415,000.00 (C$550,000.00) under "a foreign wage subsidy program."

143.    The website for Canada Emergency Wage Subsidy ("CEWS"), a COVID-19 relief plan offered in Canada, which provided employers a subsidy equal to 75% of employee wages on the first $44,000.00 (C$58,700.00) per employee. Publicly available information on the website indicates that the Company received $415K in 2020 as follows: $27,000.00 in Q1, $225,000.00 in Q2, and $115,000.00 in Q3.

144.    Based on the funds applied for and received from CEWS and based upon information known to Plaintiffs regarding the salaries of the employees at the Company (which were generally $45,000.00 or more), Plaintiffs believe that Defendant reduced the number of employees at the Company below 35 during either the First or Second Earnout Period.

145.    In addition, based on Plaintiffs' examination of LinkedIn records, the number of employees who were associated with the Company during the First and/or Second Earnout Periods fell below 35.

146.    The above represents what Plaintiffs were able to ascertain based on information that they *did* have access to – but clearly, Plaintiffs were contractually entitled to more information from Defendant to ascertain exactly how many employees were employed by the Company during the First and Second Earnout Periods.

147.    Despite repeated requests by Plaintiffs, Defendant has refused to provide any information to Plaintiffs in order to enable Plaintiffs to determine whether Defendant reduced the Company's workforce to less than 35 employees either during the First Earnout Period or Second Earnout Period, and to determine whether Plaintiffs were entitled to be paid either $3,000,000.00, $1,750,000.00 or nothing.

148.    In response to Plaintiffs' many requests, Defendant could have easily, through any number of ways, demonstrated that Defendant never reduced the Company's workforce to less than 35 employees. Nevertheless, Defendant repeatedly refused to do so – in response to the multiple informational requests from Mr. Barnard.

149.    Defendant could have easily provided payroll records, employee lists, accounting records, internal employee rosters, employment agreements or any number of other administrative documents to simply prove that at no time had the number of employees been reduced below 35. Defendant further provided no "org chart" or even so much as a statement or a verification from any third-party (such as an auditor).

150.    All of this information was requested by Plaintiffs and was peculiarly in Defendant's control. Defendant refused to provide it.

151.    Rather than produce the documentation, Defendant has consistently avoided the topic and hidden the ball. Defendant has resorted to obfuscation and refusal to answer Plaintiffs' attempts to obtain this basic information in order to ascertain definitively whether the Acceleration Event had occurred.

152.    Given the ease with which this information could be provided and confirmed if available, Defendant's consistent refusal to do so, except for the failed attempt to provide fraudulent information, is a clear indication that no such information exists, leading to the

inescapable conclusion that Defendant reduced the number of employees at the Company to below 35 during either the First Earnout Period or Second Earnout Period, and that Plaintiffs are entitled to a payment pursuant to the SPA due to the occurrence of an Acceleration Event.

153.    Defendant have left Plaintiffs with no other option than to pursue relief in this Court for payment pursuant to the exclusive venue provision of Article 11.10 of the SPA, which mandates that *any legal or equitable action or* proceeding arising under or in connection with this Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware.

154.    Defendant's breach of its failure to pay pursuant to §1.8(e) does *not* constitute a disagreement with respect to an Earnout Statement and is *not* subject to resolution by a Final Accounting Firm pursuant to Section 1.8(c) of the SPA. Earnout Statements were statements "calculating whether the Financial Goals have been achieved." SPA, §1.8(b) as set forth at Appendix 1 to Exhibit B of the SPA. Earnout Statements under the SPA did not address whether Acceleration Events had or had not occurred.

155.    The question of whether Defendant reduced the number of employees below the number required by the SPA does not fall within any arbitration provision nor is it within the scope of the Final Accounting Firm's determination. This claim arises from and pertains to adherence to the SPA and may also require a legal interpretation of terms such as "employee," both of which are outside the bounds of the Final Accounting Firm.

156.    Defendant's misconduct, as detailed herein, was fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows for actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's failure to make payment in accordance with the terms of the SPA as a result of the occurrence of the aforementioned Acceleration Event, in an amount to be determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT II

## BREACH OF CONTRACT

## (OPERATION OF COMPANY'S BUSINESS)

157.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

158.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

159.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

160.    Pursuant to Section 1.8(a), of the SPA, Defendant was obligated to 1) carry on the Company's business in the ordinary course and 2) act in good faith with respect to the operation of the Company's business, 3) act in a commercially reasonable manner with respect to the operation of the Company's business, and 4) not cause its employees to take actions in the operation of the Company's business in bad faith with the principal purpose of avoiding the payment of Earnout Consideration and having a material direct negative effect on the Company's revenue for purposes of achieving the Financial Goals.

161.    Specifically, Section 1.8(a) provided as follows:

> 1.8   Earnout.
>
> (a)   Each of the parties acknowledges and agrees that the business of the Company shall be carried on in the ordinary course during each Earnout Period. Without limiting the foregoing and for greater certainty, during each Earnout Period, Parent shall act in good faith and in a commercially reasonable manner with respect to the operation of the Company's business and shall not, and shall cause each of its subsidiaries not to, and shall require each of their respective employees and agents not to, take any actions (or fail to take any action) in the operation of the Company's business: in bad faith with the principal purpose of; (i) avoiding the payment of any Earnout Consideration with respect to any particular Earnout Period; or (ii) having a material direct negative effect on the Company's revenue or OIBA for purposes of achieving the Financial Goals.

162.   Defendant breached Section 1.8(a) of the SPA by 1) failing to carry on the business in the ordinary course, 2) failing to act in good faith with respect to the operation of the Company's business, 3) failing to act in a commercially reasonable manner with respect to the operation of the Company's business, and 4) causing its employees to take actions in the operation of the Company's business in bad faith with the principal purpose of avoiding the payment of Earnout Consideration and having a material direct negative effect on the Company's revenue for purposes of achieving the Financial Goals.

163.   If, in fact, the Company did not achieve the Financial Goals, as Defendant has claimed (but has not adequately demonstrated in response to Plaintiffs' requests for information), then such failure was a direct result of Defendant's aforementioned breaches and caused Plaintiffs to be deprived of the Earnout Consideration for the First Earnout Period and Second Earnout Period.

164.   Defendant failed to manage the Company in a manner that was focused on achieving the Company's business plan – which was suspected by Mr. Barnard and the genesis for his requests for information beginning in September 2019.

165.   Defendant did not devote the necessary resources, hire or maintain adequate personnel, or deploy the sufficient resources needed to either achieve the Company's business

plan or achieve the Financial Goals set forth on Exhibit B to the SPA. Defendant's conduct was not in the ordinary course, was not in good faith, was commercially unreasonable and was intended to avoid the payment of Earnout Consideration and to have a material direct negative effect on the Company's revenue for purposes of achieving the Financial Goals.

166.    As described below, Defendant's bad faith was exhibited in part through its conduct in the operations of the business and its behavior towards the Company's former CEO, Andrew Osmak.

167.    After the closing of the SPA, Osmak was designated as the funnel for communications between Marchex and Telmetrics – with his counterpart at Marchex being Mr. Andy Smith – a Marchex executive.

168.    Osmak was to continue as CEO of the Company and would lead all sales efforts as the Company's head of sales (in addition to his other duties as CEO).

169.    Marchex, through its CFO Mike Arends, also informed Osmak that he would be the funnel for all communications between Marchex and the Company and would be responsible to identify any acts not in good faith in the part of Marchex against the Company.

170.    Starting in December 2018, Defendant began to exhibit bad faith conduct. Soon after the closing of the SPA, Marchex informed Osmak that it had no intentions to support the Company's technology platform and attempted to convince him to accelerate efforts to migrate clients from the Company to Marchex.

171.    Marchex stripped Osmak of any authority, rendering him unable to hire, assemble, or address his staff or manage clients (Thryv and Hibu) representing 42% of Telmetrics' overall sales. Marchex further made it impossible for Osmak to perform his duties or

manage the staff, sales, clients and strategy of Telmetrics – his *primary function* as the

Company's CEO.

172.    Marchex also proceeded to move business away from the Company to Marchex.

Marchex refused to meet with clients, such as a company named Thryv, who wanted to work

with *both* the Company and Marchex – utilizing both of their services. Thryv's suggestion was

not enough for Marchex – who wanted it *all*. Marchex directed Osmak not to schedule *any* joint

meetings between Marchex, the Company and Thryv. Marchex refused to cooperate with the

Company – even when the Company requested assistance with a specific feature that would

benefit its client, Thryv.

173.    Defendant further failed to deploy adequate staffing (employees, contractors, or

consulting resources) to execute the Company's operating plan. Rather than deploy resources to

the Company, Defendant merely diverted the Company's limited resources to efforts related to

the integration of other Marchex controlled entities and communicated those integration efforts

to its public shareholders.

174.    As a result of Defendant's failures, the Company lost sales opportunities that

would have contributed to the achievement of the necessary thresholds for payment of the

Earnout Consideration to Plaintiffs. In June 2019, the Company became aware of the fact that

Marchex had wrongfully diverted the business from Thryv – who at that time was the

Company's largest customer. The business had been moved *directly* as a result of meetings that

had taken place between Thryv and Travis Fairchild, an executive vice president of Marchex.

175.    When Osmak tried to save the relationship between the Company and Thryv,

Marchex (through its attorney, Frank Feeney), threatened Osmak with litigation and forbade him

from meeting with Thryv. Marchex did this with the knowledge that this would prevent the Company from serving Thryv (its largest client).

176.    The relationship between Marchex and Osmak continued to deteriorate and Marchex's conduct eventually caused Osmak to take medical leave in June 2019 due to the mental distress caused by the threats he received from Marchex.

177.    Marchex, for its part, did nothing to replace Osmak. The failure to replace Osmak was *not* problematic merely because Defendant failed to simply assign the title of CEO to a particular individual. Rather, Defendant's conduct was reckless and unconscionable because of the critical role that Osmak had played at the Company prior to the closing of the SPA and Defendant's failure to replace the actual functions and value that Osmak had been providing to the Company.

178.    Without Osmak's presence, Defendant did not replace him with an individual to fulfill his duties to guide the Company's operations, instruct employees, and communicate with existing and potential customers. These were critical roles that Osmak had been serving for the Company and as a result of Defendant's failure to fill the void, the Company began to suffer and continues to suffer.

179.    Without Osmak, or any CEO to guide the Company's operations, instruct employees, and communicate with customers, Defendant did not hire additional sales/business development resources. There was a conscious and deliberate decision by Defendant to not replace Mr. Osmak, who was, until the time of his leave and subsequent termination, was the primary business development resource and had been serving as the *de facto* head of sales for the Company.

40

180.    Osmak returned from medical leave to the Company on June 15, 2019 – only to find out that he was forbidden by Marchex from communicating with certain Marchex executives. Marchex further refused to provide him with any update about any cooperation between Marchex and the Company. Osmak was effectively prevented from proposing any business solutions or proposals to either Thryv or Marchex on behalf of the Company.

181.    Osmak was continuously directed *not* to communicate with Thryv – which prevented him from managing the relationship at all with Thryv, the company that represented 25% of the Company's total revenues.

182.    Marchex's "starve out" continued in July and August 2019, when Marchex next targeted Hibu – the Company's *second* largest client.

183.    Osmak was told by Marchex to "maximize for Marchex." Osmak was excluded from communications and knew that the loss of Hibu would be catastrophic to the Company.

184.    In a July 29, 2019 meeting, Osmak was told by Marchex *not* to contact Thryv or Hibu (both of whom represented 42% of the Company's revenue), not to address the Company's staff without prior approval, that he could no longer hire employees for the Company, that a new board of directors had been formed for the Company and that he was to change the previously approved Company business plan and to present an updated plan to the Company's Board of Directors.

185.    Marchex's conduct caused Osmak to take a second medical leave in August 2019 due to the mental distress caused by the threats he received from Marchex.

186.    Osmak's employment with Marchex ended in March 2020.

187.    In addition, Mike Arends (CFO and SVP of Marchex), made public comments that Marchex was integrating the Company's operations with Marchex's operations in the *first*

*year* after the closing of the SPA, which was not in the ordinary course of the Company's

business.

188.    Due to Defendant's repeated deliberate refusal to provide documentation and

information to Plaintiffs, Plaintiffs' knowledge regarding the specifics of Defendant's breaches is

limited and Plaintiffs have been materially prejudiced in their ability to articulate these claims

under the SPA or exercise their rights under §1.8 of the SPA.

189.    Upon information and belief, if Defendant is required to produce the books,

records and working papers of the Company, as they were obligated to do, the factual

information within Defendant's knowledge or control will reveal further facts and evidence of

Defendant's misconduct and failure to operate the Company carried on the Company's business

in the ordinary course, act in good faith with respect to the operation of the Company's business,

act in a commercially reasonable manner with respect to the operation of the Company's

business, and actions taken in the operation of the Company's business in bad faith with the

principal purpose of avoiding the payment of Earnout Consideration and having a material direct

negative effect on the Company's revenue for purposes of achieving the Financial Goals.

190.    Defendant's conduct was not in the ordinary course, was not in good faith, was

commercially unreasonable and was intended to avoid the payment of Earnout Consideration and

to have a material direct negative effect on the Company's revenue for purposes of achieving the

Financial Goals.

191.    As a direct and proximate result of Defendant's breaches of Section 1.8(a) of the

SPA, Plaintiffs were damaged, including but not limited to the fact that they did not receive

payment of the Earnout Consideration which they would have been paid under the terms of the

SPA had Defendant 1) operated the Company carried on the Company's business in the ordinary

course, 2) acted in good faith with respect to the operation of the Company's business, 3) acted

in a commercially reasonable manner with respect to the operation of the Company's business,

or 4) not caused its employees to take actions in the operation of the Company's business in bad

faith with the principal purpose of avoiding the payment of Earnout Consideration and having a

material direct negative effect on the Company's revenue for purposes of achieving the Financial

Goals.

192.    Had Defendant performed its obligations to operate the Company as required by

§1.8(a) of the SPA, the Company would have met the Financial Goals and performed in such a

manner that would have resulted in Plaintiffs being paid as much as $3,000,000.00, the full

amount of the Earnout Consideration, pursuant to §1.2(b) of the SPA.

193.    These claims arise from and pertain to adherence to the SPA and requires a legal

interpretation that is outside the bounds of the Final Accounting Firm. The questions of whether

Defendant 1) carried on the business in the ordinary course, 2) acted in good faith with respect to

the operation of the Company's business, 3) acted in a commercially reasonable manner with

respect to the operation of the Company's business require a legal interpretation, or 4) caused its

employees to take actions in the operation of the Company's business in bad faith with the

principal purpose of avoiding the payment of Earnout Consideration and having a material direct

negative effect on the Company's revenue for purposes of achieving the Financial Goals, do not

fall within any arbitration provision nor are they within the scope of the Final Accounting Firm's

determination.

194.    Defendant's misconduct, as detailed in this Second Amended Complaint, was

fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and

interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendant, for actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's breaches of the SPA, in an amount to be determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT III

## BREACH OF CONTRACT

## (REASONABLE ACCESS TO BOOKS, RECORDS AND WORKING PAPERS)

195.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

196.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

197.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

198.    Pursuant to Section 1.8(c), of the SPA, Defendant had a general obligation give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under Section 1.8. See SPA, §1.8(c).

199.    Plaintiffs' "rights" under Section 1.8 of the SPA included, by way of example, rights that Defendant carry on the business in the ordinary course, act in good faith and in a

commercially reasonable manner with respect to the operation of the Company's business and not cause its employees to take actions in the operation of the Company's business in bad faith with the principal purpose of avoiding the payment of Earnout Consideration and having a material direct negative effect on the Company's revenue for purposes of achieving the Financial Goals.

200.    Without reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under Section 1.8. Plaintiffs had no way to confirm, determine or evaluate whether an Acceleration Event had occurred.

201.    Without reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under Section 1.8. Plaintiffs had no way to confirm, determine or evaluate whether Defendant was performing its obligations under §1.8 of the SPA, including whether Defendant was 1) carrying on the business in the ordinary course, 2) acting in good faith with respect to the operation of the Company's business, 3) acting in a commercially reasonable manner with respect to the operation of the Company's business or 4) interfering in the operation of the Company's business in bad faith.

202.    Without reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants, Plaintiffs were and are limited in their ability to identify and pursue their claims for Defendant's multiple breaches of the SPA and of Section 1.8.

203.    Without reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to

exercise their rights under Section 1.8, Plaintiffs were without the requisite information needed to provide a written submission to a Final Accounting Firm, had Defendant retained the Final Accounting Firm, which it never did.

204.    As detailed herein, Defendant consistently refused to provide Plaintiffs with reasonable access to the books and records and working papers of the Company, which constituted a breach of its obligation to give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants.

205.    As a direct and proximate result of Defendant's breaches and the refusal to provide Plaintiffs with reasonable access to the books and records and working papers of the Company, Plaintiffs were unable to exercise their rights under the SPA, and suffered damages, including but not limited to the fact that they could not exercise their rights under Section 1.8 of the SPA and that they did not receive payment of the Earnout Consideration, or up to $3,000,000.00, which they would have been paid under the terms of the SPA.

206.    These claims arise from and pertain to adherence to the SPA and requires a legal interpretation that is outside the bounds of the Final Accounting Firm. The question of whether Defendant granted reasonable access to Plaintiffs to the books and records and working papers of the Company requires a legal interpretation that does not fall within any arbitration provision nor is it within the scope of the Final Accounting Firm's determination.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows awarding actual, compensatory, indirect, consequential, punitive and other damages, in an amount to be determined at trial, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper;

## COUNT IV

## BREACH OF CONTRACT

## (SPA EARNOUT STATEMENT PROCEDURES)

207.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

208.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

209.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

210.    Pursuant to Section 1.8(b), of the SPA, no later than 75 days following the conclusion of each Earnout Period, Defendant was obligated to prepare and deliver the following to Plaintiffs:

        a.      an "Earnout Statement" (defined as a "statement calculating whether Financial Goals have been achieved");

        b.      such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request.

211.    Specifically, Section 1.8(b) provided as follows:

> (b)    The Parent shall prepare and deliver to the Shareholder Representatives, no later than seventy five (75) days following the conclusion of each Earnout Period, a statement calculating whether the Financial Goals have been achieved (each an "Earnout Statement") and such other supporting accounts, reports, ledgers and information as the Shareholder Representatives may reasonably request. For illustration purposes only, an example of the calculation of the Financial Goals is found at Appendix 1 to Exhibit B.

212.    Further, in the event that there was a disagreement over an Earnout Statement, Marchex and the Shareholder Representatives agreed to attempt to resolve those disagreements in good faith. *See* SPA, §1.8(c).

213.    Section 1.8(c) provided as follows:



        (c)    If the Shareholder Representatives disagree with an Earnout Statement, the Shareholder Representatives shall notify the Parent on or before the date fifteen (15) days after the date on which the Parent delivers to the Shareholder Representatives such Earnout Statement, failing which such Earnout Statement shall be deemed to be accepted by the Sellers with respect to the corresponding Earnout Period.  The Parent and the Buyer shall give the Shareholder Representatives and their professional advisors reasonable access to the books and records and working papers of the Company and its Subsidiaries and their accountants to enable the Shareholder Representatives to exercise their rights under this Section 1.8.  The Parent and the Shareholder Representatives shall attempt to resolve any such disagreements in good faith.  If the

5

CAN: 28618682.8

Parent and the Shareholder Representatives are unable to resolve all such disagreements on or before the date fifteen (15) days following notification by the Shareholder Representatives of any such disagreements, the Parent shall retain the Final Accounting Firm to resolve all such disagreements, who shall adjudicate only those items still in dispute with respect to the Earnout Statement.

214.    If a dispute over an Earnout Statement could not be resolved on or before the date 15 days following notification by the Shareholder Representatives of any such disagreements, **<u>Defendant</u>** was obligated to retain an accounting firm ("Final Accounting Firm") for the sole purpose of resolving disagreements over the Earnout Statement. *See* SPA, §1.8(c).

215.    Per Section 1.8(c) of the SPA, the role of the Final Accounting Firm was limited to *"only adjudicate those items still in dispute with respect to the Earnout Statement."*

### *First Earnout Statement*

216.     On January 16, 2020, Defendant sent the First Earnout Statement. Defendant claimed that the Earnout Consideration was not payable for the First Earnout Period.

217.     Shareholder Representatives, through counsel, sent timely notice, in compliance with the SPA, to Defendant of the Shareholder Representatives' dispute with the First Earnout Statement and notifying Defendant that the Shareholder Representatives did not accept the First Earnout Statement.

218.     Plaintiffs further advised Defendant that Defendant had failed to provide information reasonably requested by Shareholder Representatives (i.e., supporting accounts, reports, ledgers and information) in connection with the First Earnout Statement. The correspondence further reiterated Shareholder Representatives' request for information, stating that Defendant had failed to provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2019 conclusion of the First Earnout Period.

219.     Defendant never provided the information and as outlined in this Second Amended Complaint, did not cooperate in good faith, as it was obligated to do, with any of Plaintiffs' attempts to resolve the disagreements.

220.     To this date, the parties have been unable to resolve Plaintiffs' disagreements with the First Earnout Statement.

221.     With respect to the First Earnout Statement, Defendant breached its obligations pursuant to §1.8(c) of the SPA as follows:

a.      Defendant did not provide supporting accounts, reports, ledgers and information as the Shareholder Representatives reasonably requested, pursuant to §1.8(b) of the SPA;

b.      Defendant did not attempt to work in good faith to resolve the disagreements with Plaintiffs regarding the First Earnout Statement;

c.      Defendant did not retain a Final Accounting Firm to resolve the items in dispute with respect to the First Earnout Statement, as Defendant was obligated to do pursuant to §1.8(c) of the SPA, due to the fact that Plaintiffs and Defendant were unable to resolve all of their disagreements regarding the First Earnout Statement on or before the date 15 days following notification by Plaintiffs of the disagreement.

### ***Second Earnout Statement***

222.    On January 14, 2021, Defendant sent the Second Earnout Statement. Defendant claimed that the Earnout Consideration was not payable for the Second Earnout Period.

223.    On January 18, 2021, Shareholder Representatives, through counsel, sent timely notice, in compliance with the SPA, to Defendant of the Shareholder Representatives' disagreement with the Second Earnout Statement and notifying Defendant that the Shareholder Representatives did not accept the Second Earnout Statement.

224.    Shareholder Representatives further advised Defendant that Defendant had failed to provide information reasonably requested by Shareholder Representatives in connection with the Second Earnout Statement. The correspondence further reiterated Shareholder Representatives' request for information, stating that Defendant risked a second breach of the SPA if it did not provide the information reasonably requested within the required timeframe of

seventy-five (75) days following the November 5, 2020 conclusion of the Second Earnout Period.

225.    Defendant did not provide the information reasonably requested within the required timeframe of seventy-five (75) days following the November 5, 2020 conclusion of the Second Earnout Period.

226.    To this date, the parties have been unable to resolve Plaintiffs' disagreements with the Second Earnout Statement.

227.    With respect to the Second Earnout Statement, Defendant breached its obligations pursuant to §§1.8(b) and (c) of the SPA as follows:

a.    Defendant did not provide supporting accounts, reports, ledgers and information as the Shareholder Representatives reasonably requested, pursuant to §1.8(b) of the SPA;

b.    Defendant did not attempt to work in good faith to resolve the disagreements with Plaintiffs regarding the Second Earnout Statement;

c.    Defendant did not retain a Final Accounting Firm to resolve the items in dispute with respect to the Second Earnout Statement, as Defendant was obligated to do pursuant to §1.8(c) of the SPA, due to the fact that Plaintiffs and Defendant were unable to resolve all of their disagreements regarding the Second Earnout Statement on or before the date 15 days following notification by Plaintiffs of the disagreement.

228.    Defendant deliberately, knowingly, voluntarily and intentionally breached all of the foregoing obligations.

229.    Defendant did not retain a Final Accounting Firm to resolve the aforementioned disputes because Defendant's misconduct had effectively eliminated Plaintiffs' ability to meaningfully participate or provide a written submission with any material information for the Final Accounting Firm to consider. This left Plaintiffs with no choice but to seek relief in this Court.

230.    Not only did Marchex fail to retain a Final Accounting Firm to resolve Plaintiffs' disputes, but Marchex *itself* filed litigation against *Plaintiffs* in Canada, in relation to its indemnification claims, claims which were incorporated into the earnout statements.

231.    With full knowledge of the disputes by Plaintiffs regarding the earnout statements, on December 22, 2021, Marchex filed a lawsuit, captioned as *Telmetrics Corp. and Marchex, Inc. v. Andrew Osmak, Christopher Barnard, Sinc McEvenue and Richard Zurawski* in the Superior Court of Justice, Ontario, Canada (Court File No. CV-21-00674206-0000) ("Canadian Lawsuit"). [7]

232.    In the Canadian Lawsuit, Marchex asserts claims against Andrew Osmak, Christopher Barnard and Sinc McEvenue, all of whom are Shareholder Representatives under the SPA, for claims that arise under and are in connection with the SPA. Marchex's claims include conspiracy, fraud, breach of contract, and knowing assistance in breach of fiduciary duty and directly pertain to Marchex's claims regarding Telmetrics' financial projections in connection with the SPA and in connection with the Earnout Statement.

233.    Even if the issues raised by Plaintiffs were within the purview of the Final Accounting Firm, which Plaintiffs dispute, Defendant released and/or waived its right to enforce or seek resolution of any applicable disputes by a Final Accounting Firm by failing to engage a

---

[7] A true and correct copy of the Canadian Lawsuit is attached hereto as Exhibit 2.

Final Accounting Firm and then *itself* initiating the Canadian Lawsuit in an improper forum, rather than Delaware, the forum chosen by the parties in the SPA.

234.   Moreover, Marchex failed to perform the conditions precedent to the retention of the Final Accounting Firm, which were 1) to give Plaintiffs reasonable access to the books and records and working papers of the Company and 2) to attempt to resolve any such disagreements in good faith.

235.   Had Marchex given Plaintiffs supporting accounts, reports, ledgers and information as the Shareholder Representatives reasonably requested, attempted to resolve any such disagreements in good faith and if warranted, retained a Final Accounting Firm, Plaintiffs would have been able to exercise their rights under the SPA and would have proven their entitlement to payment of the Earnout Consideration.

236.   These claims arise from and pertain to adherence to the SPA and requires a legal interpretation that is outside the bounds of the Final Accounting Firm. The questions of whether Defendant 1) provided supporting accounts, reports, ledgers and information as the Shareholder Representatives reasonably requested, pursuant to §1.8(b) of the SPA; 2) attempted to work in good faith to resolve the disagreements with Plaintiffs regarding the First or Second Earnout Statement; and 3) waived its right to enforce or seek resolution of any applicable disputes by a Final Accounting Firm do not fall within any arbitration provision nor are they within the scope of the Final Accounting Firm's determination.

237.   As a direct and proximate result of Defendant's breaches of §§1.8(b) and (c) of the SPA, Plaintiffs were unable to exercise their rights under the SPA, and suffered damages in that they did not receive payment of the Earnout Consideration, or up to $3,000,000.00, which the full amount of the Earnout Consideration under the SPA.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows awarding actual, compensatory, indirect, consequential, punitive and other damages, for the amount of Earnout Consideration to which Plaintiffs are entitled to be paid, in an amount to be determined at trial and in excess of $75,000.00, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper;

<u>**COUNT V**</u>

<u>**BREACH OF CONTRACT**</u>

<u>**(BREACH OF SPA AND ESCROW AGREEMENT)**</u>

238.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein at length.

239.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

240.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

241.    The Escrow Agreement is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

242.    Plaintiffs performed all of their obligations and all conditions precedent under the Escrow Agreement.

243.    As detailed above, pursuant to the SPA and the Escrow Agreement (which was attached as Exhibit C to the SPA), an aggregate of $1,010,000.00 was held in escrow by the Escrow Agent, to be released to Shareholders on the "Escrow Release Date" – or eighteen months after the November 5, 2018 Closing Date (i.e., May 5, 2020).

244.    Pursuant to the SPA and Article III of the Escrow Agreement, Defendant was permitted to offset the amount of any *actual* indemnification claims against the escrow funds. In the absence of any *actual* indemnification claims, however, in the first 12 months following the Closing, the Escrow Deposit was to be reduced to $250,000.00 – and the Shareholders were to receive the $760,000.00.

245.    Section 10.2(a) of the SPA required that, in the event of the occurrence of an event pursuant to which Defendant would seek indemnity pursuant to Section 10.1, Defendant was required to 1) provide Plaintiffs with *prompt* written notice (a "Claim Notice") of such event and 2) promptly make available to Plaintiff all relevant information which is material to the claim and which is in the possession of Defendant.

246.    Section 3.2 of the Escrow Agreement also required Defendant to *promptly* notify Plaintiffs and the Escrow Agent of an event which Defendant asserts constitutes an "Indemnifiable Matter" and to set forth the reasonable foreseeable maximum amount of its claim and the basis of such a claim, while making available to the Shareholder Representatives *all relevant information* regarding such "Indemnifiable Matter" which was in the possession of Defendant.

247.    On November 1, 2019, just days before the 12-month anniversary of the Closing Date, when the Escrow Deposit was scheduled to be reduced to $250,000.00 per §3.1 of the Escrow Agreement, Defendant sent a correspondence, listing a number of incomprehensible and intentionally vague claim descriptions, without any identified losses and without indicating exactly *when* any of the claims purportedly occurred.

248.    The entirety of the information provided by Defendant was contained in four

nonsensical and virtually unintelligible bullet points, as demonstrated in the following "Annex I"

of the November 1, 2019 correspondence:

---

**ANNEX I**

**Indemnification Claims**

- Hibu, Inc. credit calculation error and additional credit obligation for 2017/2018.

- Infutor liability for contract non-compliance (cacheing of call data).

- Unblocked spam/spoofing call traffic in 2018 that was included in billings and collections to customers.

- Projected financial results and whether reasonable good faith estimates (for example: projected revenue for 2019 of up to US $12.4 million).

Our assessment of the above claims results in estimated Losses in excess of US $760,000.

---

249.    The November 1, 2019 correspondence failed to meet the conditions precedent of

the SPA and the Escrow Agreement, did not constitute a valid "Claim Notice" and thus,

Defendant's subsequent conduct to wrongfully effectuate the transfer of the $760,000.00 was in

breach of both the SPA and the Escrow Agreement.

250.    First, the November 1, 2019 correspondence *was not sent promptly* after the

alleged occurrence of any of the alleged events, as required pursuant to §10.2 of the SPA and

§3.2 of the Escrow Agreement. On the contrary, the November 1, 2019 correspondence was sent

at the last possible minute, on November 1, 2019, just days before the 12 month anniversary of

the November 5, 2018 Closing Date, when the Escrow Deposit was scheduled to have been reduced to $250,000.00 and the $760,000.00 was supposed to have been sent to Plaintiffs.[8]

251.    Second, Defendant's November 1, 2019 correspondence did *not* satisfy the condition precedent of identifying an event constituting an Indemnifiable Matter from which Losses *had* occurred, as required by the SPA, and pursuant to §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was substantially ambiguous, uncertain and equivocal, stating merely that "Losses" relating to "Indemnification Claims" "*may have occurred.*"

252.    Third, Defendant's November 1, 2019 correspondence did *not* set forth Defendant's good faith estimate of the reasonably foreseeable maximum amount of its claim for indemnification as required by the SPA and by §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was patently vague and ambiguous, merely stating that there were "estimated Losses in excess of US $760,000.00." Defendant did not even address, let alone fulfill, the requirement to provide a good faith estimate of the reasonably foreseeable maximum amount of its claim, which, in the case of Excluded Obligations or fraud, could have exceeded $1,010,000.00, pursuant to §10.4(a) of the SPA.

253.    Fourth, Defendant's November 1, 2019 correspondence did *not* make available to the Shareholder Representatives all relevant information regarding any Indemnifiable Matter which was in the possession of Defendant, as required by the SPA and §3.2 of the Escrow

---

[8] In connection with only with "Third-Party Claims", as defined in the SPA, §10.2 of the SPA provides that Parent's failure to give a timely Claim Notice or to promptly furnish the Shareholder Representative, with any relevant data and documents shall not constitute a defense (in part or in whole) to any claim for indemnification by such party, except and only to the extent that such failure shall result in any prejudice to the indemnified party. Defendant's failure to identify any Third-Party Claims renders this provision inapplicable and irrelevant to any excuse Defendant may try to assert for its failure to abide by its prompt notification obligations.

Agreement. Rather, the November 1, 2019 correspondence contained nothing more than a generic list of contractual clauses – followed by four superficial bullet points – which failed to even so much as set forth the date, the nature, the substantive basis or the parties involved, clearly failing to provide "all relevant information."

254.    Defendant's failure to provide all relevant information in its possession was particularly evident, given the reference made by Defendant in Annex I of the November 1, 2019 correspondence to its "assessment" of the items on Annex I. Defendant had enough information, evidently, to "assess" the claims, but refused to make any information available to Plaintiffs, as it was obligated to do.

255.    Despite Plaintiffs' requests, Defendant consistently refused, and continued to refuse, to provide any material information to support the "claims" – which were general business expenses, vague descriptions of potential future occurrences or unintelligible observations – none of which met the definition of an "Indemnifiable Matter" under the SPA.

256.    Due to Defendant's delay in notifying Plaintiffs of their purported claims, and refusal to provide any of the required information, Plaintiffs were materially prejudiced in their ability to respond in reasonable detail (pursuant to §3.4 of the Escrow Agreement) – which the notification requirements of the SPA and the Escrow Agreement was specifically intended to prevent.

257.    For these reasons, on November 10, 2019, Mr. Barnard notified Defendant that the November 1, 2019 correspondence was not a valid Claim Notice. As Mr. Barnard advised, Defendant's November 1, 2019 letter merely contained vague references to possible losses that "may" occur in the future, and contained none of the requisite information to give rise to any

contractual right to withhold any amount of the Escrow Deposit. Accordingly, Plaintiffs demanded that the Escrow Deposit (less the $250,000.00 provided for in the SPA be released.

258.    Plaintiffs further notified U.S. Bank ("Escrow Agent") that they disputed the November 1, 2019 "Claim Notice" and advised the Escrow Agent that no amount of the Escrow was to be released to Defendant. The Escrow Agent responded to Mr. Barnard, advising that the funds would remain in escrow until the claim was jointly resolved by the parties.

259.    Thereafter, on February 3, 2020, Defendant sent a letter to the Escrow Agent, U.S. Bank, demanding that the Escrow Agent send the disputed $760,000.00 to *Defendant*. However, as described above, Defendant deliberately delivered this request by hand to the Escrow Agent, and mailed it to the Shareholder Representatives, knowing full well that there would be a considerable delay between the hand-delivered notice and the notice by mail such that the Shareholder Representatives would not have the ability to respond.

260.    On February 14, 2020, Plaintiffs' counsel notified both the Escrow Agent and Defendant that the November 1, 2019 correspondence was not a valid Claim Notice and that Plaintiffs did not agree to the release of the Escrow Deposit. Thereafter, on February 21, 2020, Plaintiffs' counsel demanded, in a letter to the Escrow Agent, that the Escrow Deposit be released to Plaintiffs.

261.    On February 24, 2020, the Escrow Agent, despite being aware of Plaintiffs' dispute, sent a correspondence to Plaintiffs' counsel, advising that it had sent the $760,000.00 to Defendant, pursuant to Defendant's February 3, 2020 correspondence.

262.    On March 9, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the release of the funds was not permitted by the Escrow Agreement.

263.    Specifically, Section 3.3 of the Escrow Agreement does not provide for the release of any amount to Defendant in the absence of a determination with respect to an indemnification claim by Defendant.

> 3.3    Claims Not Disputed by Company and/or the Shareholder Representatives. If, within thirty (30) days after the Escrow Agent's receipt of the notice described in Section 3.2 hereof, the Shareholder Representatives have not given the Escrow Agent the notice provided for in Section 3.4 hereof, the Parent shall be entitled to make demand upon the Escrow Agent that it retain for future return to the Parent as and when the amount is determined pursuant to the provisions hereof, if it is not then determined, or that it then disburse to the Parent, if it has then been determined, an amount of the Escrow Deposit having a value equal to the lesser of (i) the full amount set forth in the notice described in Section 3.2 or (ii) the entire Escrow Deposit. The Escrow Agent may conclusively rely on any such Parent demand.

*See* Escrow Agreement, Section 3.3.

264.    As of the February 3, 2020 date when Defendant wrongfully demanded the release of the $760,000.00, no valid Claim Notice had been delivered, no document-supported claim had been advanced by Defendant and certainly no determination has been made of the amount of any of the claim.

265.    Significantly, the items referenced in Defendant's November 1, 2019 correspondence were *not* absolute as to liability and *not* liquidated as to amount.

266.    While §3.1 of the Escrow Agreement expressly permitted Marchex to assert unliquidated indemnification claims, it did not allow for Marchex to obtain any portion of the Escrow Deposit while those claims were still *not* absolute as to liability and *not* liquidated as to amount.

267.    Nonetheless, Defendant willfully ignored, disregarded and breached the terms of the Escrow Agreement, which provided a mechanism for Defendant to request that the Escrow Agent *at best* withhold the amount set forth in the notice, regarding its claims, which were *not* absolute as to liability and *not* liquidated as to amount.

60

268.    Instead, Defendant intentionally, knowingly and willfully skipped over this step entirely, wrongfully requesting, causing and pressuring the Escrow Agent to release $760,000.00 to *Defendant*, after the Escrow Agent had already expressed to Mr. Barnard that it would hold the funds in escrow – and then changing its mind as a result of being coerced and pressured by Defendant. Defendant's improper conduct was a breach of the SPA and the Escrow Agreement and caused Plaintiffs to suffer damages by depriving Plaintiffs of the $760,000.00, which belonged to Plaintiffs.

269.    As a direct and proximate result of Defendant's failure to fulfill the conditions precedent to a valid and proper Claim Notice under the SPA and the Escrow Agreement, Defendant's November 1, 2019 correspondence was *not* a Claim Notice, was void and was of no effect. Moreover, Defendant was required to, but never did, send a Notice to Withhold, to request that the Escrow Agent withhold any of the amounts referenced in the November 1, 2019 correspondence, thus rendering the document void as a Claim Notice – even if it *had* been a valid Claim Notice (which it was not).

270.    As a result of Defendant's failure to perform the conditions precedent to maintain the Escrow Agent's ability to withhold the $760,000.00, those funds held in the Escrow Deposit should have been distributed by the Escrow Agent to the Shareholder Representatives promptly after the Escrow Release Date.

271.    On May 1, 2020, Defendant's counsel sent to the Shareholder Representatives an "Updated Claim Notice" – demanding that the Escrow Agent retain the remaining $250,000.00 of the Escrow Deposit.

272.    In the May 1, 2020 correspondence, Defendant made a limited request, pursuant to §3.7 of the SPA, that the Escrow Agent withhold $250,000.00 remaining in the custody of the

Escrow Agent with respect to the matters in the May 1, 2020 correspondence – without making any reference to any of the claims or amounts set forth in the November 1, 2019 correspondence.

273.    On May 5, 2020, Plaintiffs' counsel sent a letter to the Escrow Agent, advising that the remaining $250,000.00 in escrow was to be released to Plaintiffs, in addition to the $760,000.00, which should have been released to Plaintiffs on November 5, 2019.

274.    The remaining $250,000.00 (with interest earnings) remains in the custody of the Escrow Agent, which Plaintiffs contend should be released to Plaintiffs.

275.    Just like the November 1, 2019 correspondence, the May 1, 2020 "Updated Claim Notice, was deficient as follows:

a.      It *was not sent promptly* after the alleged occurrence of any of the alleged events, as required pursuant to §10.2 of the SPA and §3.2 of the Escrow Agreement, and was sent at the last possible minute, on May 1, 2020, just days before the May 5, 2020 Escrow Release Date;

b.      It did *not* satisfy the condition precedent of identifying an event constituting an Indemnifiable Matter from which Losses *had* occurred, as required by the SPA, and pursuant to §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was substantially ambiguous, uncertain and equivocal, stating merely that "Losses" relating to "Indemnification Claims" "*may have occurred.*"

c.      It did *not* set forth Defendant's good faith estimate of the reasonably foreseeable maximum amount of its claim for indemnification as required by the SPA and by §3.2 of the Escrow Agreement. Rather, the November 1, 2019 correspondence was patently vague and ambiguous, merely stating

that there were "estimated Losses in excess of US $1,010,000.00" and "up to and potentially in excess of the full Purchase Price." In fact, based upon Marchex's pleadings in the lawsuit it filed against Plaintiffs in Canada, captioned as *Telmetrics Corp. and Marchex, Inc. v. Andrew Osmak, Christopher Barnard, Sinc McEvenue and Richard Zurawski* in the Superior Court of Justice, Ontario, Canada (Court File No. CV-21-00674206-0000) ("Canadian Lawsuit"), it would appear that Marchex's indemnification claims are substantially more than $1,010,000.00. Marchex claims that Plaintiffs and Osmak committed fraud in connection with the SPA and "coordinated in an attempt to advantage the former Telmetrics' shareholders regarding the earnout by misrepresenting material matters on the Conflicted Issues to [Telmetrics Corp. and Marchex, Inc.]." Canadian Lawsuit, ¶56. The Canadian lawsuit claims $25,000,000.00 in damages for the fraudulent misrepresentation, far above the $1,010,000.00 maximum set forth in the November 1, 2019 correspondence.

d.    It did *not* make available to the Shareholder Representatives all relevant information regarding any Indemnifiable Matter which was in the possession of the Defendant, as required by the SPA and §3.2 of the Escrow Agreement. Rather, the May 1, 2020 Updated Claim Notice merely listed various contractual clauses – followed by four superficial bullet points – which failed to even so much as set forth the date, the

nature, the substantive basis or the parties involved, clearly failing to provide "all relevant information."

276.    Despite Plaintiffs' requests, Defendant consistently refused, and continues to refuse, to provide any material information to support the "claims" – which were nothing more than general business expenses and did not meet the definition of an "Indemnifiable Matter" under the SPA.

277.    Due to Defendant's refusal to provide any of the required information, Plaintiffs have been materially prejudiced in their ability to respond in reasonable detail (pursuant to §3.4 of the Escrow Agreement) – which the notification requirements of the SPA and the Escrow Agreement was specifically intended to prevent.

278.    There exists a real, live, immediate and justiciable case or controversy between Plaintiffs and Defendant regarding the entitlement of the remaining $250,000.00 of Escrow Deposit being held by the Escrow Agent.

279.    The parties are in need of a declaratory judgment declaring their rights and obligations to the Escrow Deposit under the SPA and the Escrow Agreement.

280.    In addition to money damages for the $760,000.00 portion of the Escrow Deposit wrongfully taken by Defendant, Plaintiffs seeks a judicial declaration with respect to their entitlement to the remaining $250,000.00 of Escrow Deposit being held by the Escrow Agent under the SPA and the Escrow Agreement.

281.    This claim arises from and pertains to adherence to the SPA and the Escrow Agreement and requires a legal interpretation that is outside the bounds of the Final Accounting Firm. The question of whether Defendant abided by the terms and delivered a proper, valid

Claim Notice in compliance with the SPA and the Escrow Agreement does not fall within any arbitration provision nor is it within the scope of the Final Accounting Firm's determination.

282.    Defendant's misconduct, as detailed in this Second Amended Complaint, was fraudulent, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant as follows:

a.    A judicial declaration that the November 1, 2019 correspondence was *not* a proper or valid Claim Notice;

b.    A judgment awarding actual, compensatory, indirect, consequential, punitive and other damages, as a result of Defendant's wrongful conduct with respect to the Escrow Deposit, in an amount to be determined at trial and in excess of $760.000.00;

c.    A judicial declaration that:

i.    The May 1, 2020 correspondence was *not* a proper or valid Claim Notice;

ii.    That Plaintiffs are entitled to an immediate release of the $250,000.00 currently held by the Escrow Agent, together with costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

d.    Costs, attorneys' fees, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT VI

## BREACH OF FORUM SELECTION CLAUSE

283.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

284.    The SPA is a valid contract to which both Plaintiffs and Defendant were parties as of the date of the actions complained of herein up to and including the present date.

285.    Plaintiffs performed all of their obligations and all conditions precedent under the SPA.

286.    Article 11.10 of the SPA mandates that *any legal or equitable action or proceeding arising under or in connection with this Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware.*

287.    The forum selection clause states as follows:

> 11.10   <u>Governing Law</u>.  The parties hereby agree that this Agreement, shall be governed by and construed with the laws of the State of Delaware, without giving effect to principles of conflicts of law thereunder.  Each of the parties hereby (i) irrevocably consents and agrees that any legal or equitable action or proceeding arising under or in connection with this Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware and any court to which an appeal may be taken in any such litigation, and (ii) by execution and delivery of this Agreement, irrevocably submits to and accepts, with respect to any such action or proceeding, for itself and in respect of its properties and assets, generally and unconditionally, the jurisdiction of the aforesaid courts, and irrevocably waives any and all rights such party may now or hereafter have to object to such jurisdiction.

288.    On December 22, 2021, Marchex filed a lawsuit, captioned as *Telmetrics Corp. and Marchex, Inc. v. Andrew Osmak, Christopher Barnard, Sinc McEvenue and Richard Zurawski* in the Superior Court of Justice, Ontario, Canada (Court File No. CV-21-00674206-0000) ("Canadian Lawsuit") (See Exhibit 2).

289.     In the Canadian Lawsuit, Marchex asserts claims against Andrew Osmak, Christopher Barnard and Sinc McEvenue, all of whom are Shareholder Representatives under the SPA, for claims that arise under and are in connection with the SPA. Marchex's claims include conspiracy, fraud, breach of contract (including breach of the SPA itself), and knowing assistance in breach of fiduciary duty and directly pertain to Marchex's claims regarding Telmetrics' financial projections in connection with the SPA.

290.     Marchex breached Article 11.10 of the SPA by filing the Canadian Lawsuit in Canada, an improper forum.

291.     Marchex's breach directly and proximately caused Plaintiffs to suffer damages in an amount to be determined at trial.

292.     Plaintiffs' damages include the attorneys' fees paid and costs incurred by the Shareholders, who have paid for the fees and costs incurred in the defense of the Canadian Lawsuit, which costs are ongoing and continuing due to the pendency of the Canadian Lawsuit.

293.     Plaintiffs are entitled to recover the damages suffered in an amount to be proved.

294.     Defendant's filing of the Canadian lawsuit was frivolous, malicious, oppressive and done in reckless and conscious disregard of the rights and interests of Plaintiffs, as set forth clearly in the forum selection clause. Accordingly, Plaintiffs are entitled to and request an award of punitive damages.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendant as follows awarding actual, compensatory, indirect, consequential, punitive and other damages, plus pre- and post-judgment interest, and such other and further relief as shall be just and proper.

## COUNT VII

## ABUSE OF PROCESS

295.    Plaintiffs hereby adopt and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

296.    Plaintiffs assert this claim for abuse of process against Defendant for the extraordinary costs they have incurred as a result of the Defendant's improper use of the legal process for the improper purpose of trying to obtain tactical advantage.

297.    On December 22, 2021, Marchex filed a lawsuit, captioned as *Telmetrics Corp. and Marchex, Inc. v. Andrew Osmak, Christopher Barnard, Sinc McEvenue and Richard Zurawski* in the Superior Court of Justice, Ontario, Canada (Court File No. CV-21-00674206-0000) ("Canadian Lawsuit").

298.    In the Canadian Lawsuit, Marchex asserts claims against Andrew Osmak, Christopher Barnard and Sinc McEvenue, all of whom are Shareholder Representatives under the SPA, for claims that arise under and are in connection with the SPA. Marchex's claims include conspiracy, fraud, breach of contract, and knowing assistance in breach of fiduciary duty and directly pertain to Marchex's claims regarding Telmetrics' financial projections in connection with the SPA.

299.    Despite the clear mandate in Article 11.10 of the SPA that *any legal or equitable action or* proceeding arising under or in connection with this Agreement shall be brought exclusively in the federal or state courts sitting in Wilmington, Delaware, Marchex brought the Canadian Lawsuit in the Courts of Canada, an incorrect venue.

300.     Marchex has allowed the Canadian Lawsuit to lay dormant – doing virtually nothing to advance that action, other than making their spurious claims in the pleadings that they are entitled to $25,000,000 in damages.

301.     Marchex has essentially abandoned the Canadian Lawsuit since Marchex improperly filed it. Marchex has done the minimum amount necessary to maintain the Canadian lawsuit. In both the Canadian Lawsuit and the Osmak Lawsuit, Marchex has not taken any action to advance the litigation. Discovery has *not* begun in either case nor has Marchex done anything to advance either case.

302.     Marchex has, however, improperly used the Canadian action to obtain a collateral advantage against Plaintiffs.

303.     Marchex brought their claims in Canada for ulterior purpose in initiating the Canadian lawsuit in Delaware, specifically, to delay this action, which Marchex anticipated would be filed in Delaware, the proper forum for these claims. Marchex has, in fact, followed through on that improper purpose and willfully invoked the existence of that suit as a basis to delay this action in Delaware in both its statements to the Court and the communications between the parties. Marchex has used the Canadian Lawsuit, which should have never been filed in Canada, towards the illegitimate objective of preventing Plaintiffs from pursuing their claims under the SPA in Delaware, the contractually mandated venue.

304.     Between their affirmative claims in the Canadian Lawsuit and their counterclaims in the Osmak Lawsuit, Marchex makes unsubstantiated claims that it suffered losses in excess of $55 million dollars. Marchex has also claimed $1,000,000.00 in punitive damages in the Canadian Lawsuit.

305.    Demonstrative of the frivolous nature of Marchex's claims in the Canadian lawsuit, Marchex has failed to report any of these purported losses in its public disclosures, indicating that Marchex either 1) did *not* suffer any of the losses it claims in either lawsuit, or 2) has not communicated the losses that it allegedly suffered to its shareholders, as it is required to do.

306.    Defendant committed a willful act in the use of process not proper in the regular conduct of the proceedings by using the filing of its SPA claims in Canadian Lawsuit and the counterclaims in the Osmak lawsuit to delay and prevent Plaintiffs from their pursuit of claims against Marchex in this action.

307.    Defendant has also committed a willful act in the use of process not proper in the regular conduct of the proceedings by using the frivolous filing of its SPA claims in the Canadian Lawsuit in order to compel the Escrow Agent to withhold the $250,000.00 currently being held in escrow, which should be released to Plaintiffs – as evidenced by Defendant's May 1, 2020 correspondence. Defendant has confirmed same in *this action*, by arguing in their motion to dismiss the Amended Complaint that the $250,000.00 is being held "pending resolution of the Canadian cases." (Dkt. 18, p. 8). In doing so, Marchex has attempted to use the pendency of the Canadian Lawsuit to obtain the payment of money and has used the Canadian Lawsuit as a threat or club against Plaintiffs.

308.    Defendant's actions, which were beyond the mere filing or maintenance of the lawsuit, were not a legitimate use of the judicial process. Defendant's actions were an act of coercion to harm designed to harm Plaintiffs and prevent them from promptly exercising their rights under the SPA and being paid $250,000.00 out of the remaining monies held by the Escrow Agent.

309.    Not only was there no excuse or justification for Marchex's actions as described above, but Defendant's actions as described above were intentional, committed with knowledge of their impropriety.

310.    Plaintiffs have been damaged and continue to be harmed by the Defendant's actions as described above. Plaintiff has been forced to incur attorneys' fees and costs in defense of the Canadian Lawsuit, has been prejudiced in its ability to advance this action and has been deprived of the remaining funds in escrow, due to Defendant's improper conduct with respect to and use of the Canadian Lawsuit.

**WHEREFORE**, Plaintiffs demand judgment in excess of $75,000.00, seek judgment against the Defendant for compensatory, direct, indirect, consequential, nominal, and punitive damages, along with attorney's fees, pre- and post-judgment interest, and such other relief as the Court may deem appropriate.

**GARIBIAN LAW OFFICES, P.C.**

*/s/ Antranig Garibian*
Antranig Garibian, Esquire (Bar No. 4962)
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE  19803
(302) 722-6885
ag@garibianlaw.com
*Counsel for Plaintiffs*